IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HENRY L. BLAKE JR., *et al.*, :
:
:
v. : Civil No. CCB-18-086
:
:
BROADWAY SERVICES, INC. :
:

## MEMORANDUM

This is an overtime dispute. The plaintiffs, security personnel of varying rank employed by Broadway Services, Inc., claim that they were deprived of the "time-and-a-half" overtime wages to which they were entitled under the federal Fair Labor Standards Act ("FLSA"). They have thus sued Broadway Services, Inc. under the FLSA, 29 U.S.C. §§ 201, *et seq.*, the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. §§ 3-401, *et seq.*, and the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab & Empl., §§ 3-501, *et seq.* At issue here is the plaintiffs' motion to conditionally certify a collective action pursuant to § 216(b) of the FLSA and to enlist the court's assistance in identifying, locating, and notifying potential class members. For the reasons considered below, the motion will be granted in part and denied in part.

## BACKGROUND

Broadway Services, Inc. ("BSI") is a Maryland corporation. It provides commercial security and concierge services to businesses, municipalities, hospitals, and universities in the Baltimore/Washington D.C. area. (*See generally* Pls.' Mot., ECF No. 15, Ex. 9-10).[1] It is a sizable operation—the BSI website asserts that Silver Star Security, BSI's security division, "is

---
[1] All citations will refer to the ECF pagination.

1

one of the largest security forces in the region." (Pls.' Mot., ECF No. 15, Ex. 9). The plaintiffs in this case are current and former security personnel employed by BSI including those who have served as Security Officers, Sergeants, Lieutenants, Captains, and Majors. (Pls.' Mot., ECF No. 15 at p. 18). They have submitted a series of declarations and other materials in support of their motion for conditional certification. (*See generally* Pls.' Decls., ECF Nos. 15-2 – 15-11). The defendant filed its response to the plaintiffs' motion for conditional certification. (ECF No. 18). It submitted numerous exhibits in support of its opposition. (ECF No. 18-1). The plaintiffs timely replied to the defendant's opposition. (ECF No. 19).

The plaintiffs' primary contention in this case is that the defendant failed to properly compensate them for overtime hours worked. (Pls.' Mot., ECF No. 15 at p. 3). They argue that, without exception, each plaintiff served as an hourly employee and none were salaried. (*Id.*) The plaintiffs further assert that BSI is a centralized operation, noting that, while there may be nominal divisions within BSI's corporate structure and disparate client locations, management, human resources, and executive officers are housed together at BSI's Monument Street headquarters in Baltimore. (*Id.* at p. 4). The plaintiffs uniformly report that they were routinely required to work far beyond 40 hours a week but that, at least upon obtaining the rank of Lieutenant, or making more than $11.36 an hour, they were rendered ineligible for overtime compensation. (*See, e.g.*, Hall Decl. at ¶ 9, ECF No. 15-4).

There are some inconsistencies on this point between the plaintiffs' declarations. The declarations of Henry L. Blake, Jr. and Herman Hunter support the contention that the denial of overtime compensation extends to all security personnel, not just those making in excess of $11.36 an hour. Both Mr. Blake and Mr. Hunter began their tenure with BSI with wages above this threshold (Blake began as a Major; Hunter as a Lieutenant) but affirm that they were told by

other employees that the overtime policy extends to the full gamut of security personnel. (*See* Blake Decl. at ¶ 5, ECF No. 15-2; Herman Decl. at ¶ 9, ECF No. 15-5). Meanwhile, the declarations of Regina Hall and Sean Robinson recount a slightly different policy. Ms. Hall and Mr. Robinson both entered BSI as Security Officers and were subsequently promoted to Captain and Major respectively. (*See* Hall Decl. at ¶ 3, ECF No. 15-4; Robinson Decl. at ¶ 3, ECF No. 15-7). They report that they were paid time and a half until they reached the rank of Lieutenant, at which point they stopped receiving time and a half for overtime hours worked. (*See* Hall Decl. at ¶ 9, ECF No. 15-4; Robinson Decl. at ¶ 9, ECF No. 15-7). The defendant, for its part, argues that Lieutenants and their superiors are exempt from the FLSA's overtime requirements, thus effectively conceding that these security personnel were not paid overtime. (*See, e.g.*, McNamee Aff. at ¶ 9, ECF No. 18-1). By contrast, it argues that personnel below the rank of Lieutenant were, at all times, paid time and a half beyond the 40-hour threshold. (*Id.* at ¶ 10).

The defendant paints a different and much more fragmented picture of BSI's operations. While the Monument Street headquarters may be the center of BSI's operations, it claims, BSI's composite security divisions are widely segregated. Silver Star Security ("SSS"), for example, provides clients with security personnel ranging from Security Officers to Majors. (*See* McNamee Aff. at ¶¶ 22-23, ECF No. 18-1). Corporate Security ("CS"), by contrast, provides clients with only Security Officers and, perhaps, Sergeants. (*Id.* at ¶ 23). According to McNamee's affidavit, CS clients also set and monitored the work schedules and pay rates of the security personnel provided by CS. (*Id.*) That said, it is unclear from the briefing who pays CS Sergeants (if they exist)[2] and whether there are exceptions to McNamee's insistence that BSI

---

[2] The McNamee Affidavit explains that "CS would provide Security Officers at [CS] sites, but would not provide any Officers at the rank of Lieutenant, Captain, or Major" seemingly leaving open the possibility that Sergeants were provided. (*See* McNamee Aff. at ¶ 22-2, ECF No. 18-1). In its opposition, the defendant claims CS Sergeants do not exist. (Def.'s Opp'n, ECF 18 at 7).

3

does not set CS officers' pay rates. ((*See* McNamee Aff. at ¶ 22, ECF No. 18-1) (stating merely that "*[i]n most cases* CS's clients provided their own supervision" (emphasis supplied); *see also* ECF No. 15-11, BSI's Human Resources Bulletin, listing scores of CS employees as "our employees")). Finally, the defendant spends considerable time contending that the respective officers' job descriptions are too disparate to permit class certification under the FLSA. (*See, e.g.*, Def.'s Opp'n, ECF No. 18 at p. 8).

Plaintiff Henry Blake first filed this suit as an individual cause of action. He has since amended the complaint to incorporate the claims of Henry C. Ward and Regina Penelope. (Pls.' Mot., ECF No. 15 at p. 1). Since that time, two additional employees have exercised their statutory right to opt-in. (*Id.* at p. 2). The plaintiffs filed this motion to certify a class on March 3, 2018. They request the court certify a class of:

> any and all security employees for the three (3) year period preceding the date of the filing of this lawsuit (beginning January 10, 2015) through the date that this Motion is granted, who have worked for Defendant Broadway Services, Inc. at any location where Defendant provides security services.

(Pls.' Mot., ECF No. 15 at p. 6). The plaintiffs also ask the court to facilitate notice to potential plaintiffs by U.S. Mail, email, and text message. (*Id.* at p. 16).

## ANALYSIS

Under the FLSA, plaintiffs may bring a collective cause of action against their employer for violations of the Act's substantive provisions. The Act's enforcement provision specifically dictates that "[a]n action to recover liability prescribed [by the statute] may be maintained against any employer . . . by any one or more employees for and on behalf of himself [*sic*] or

themselves and other employees similarly situated." 29 U.S.C. § 216(b). After the initial complaint is filed, other similarly-situated employees may become party plaintiffs by giving "consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Id.* Thus, § 216(b) "establishes an 'opt-in' scheme, whereby potential plaintiffs must affirmatively notify the court of their intentions to be a party to the suit." *Quinteros v. Sparkle Cleaning, Inc.*, 532 F. Supp. 2d 762, 771 (D. Md. 2008).

Despite sharing a similar legal standard, the "opt-in" process and certification of a collective action under the FLSA are distinct procedural mechanisms. Plaintiffs, for example, are permitted to "opt-in" to a § 216(b) action before the action is certified (indeed, two employees have done so here) and irrespective of whether a collective action is ever certified. Certification, in the FLSA context, is merely the trial court's exercise of discretionary power to notify potential class members. *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989). As the Second Circuit explained in a widely-cited footnote, "certification is neither necessary nor sufficient for the existence of a representative action under FLSA, but may be a useful 'case management' tool for district courts to employ in 'appropriate cases.'" *Myers v. Hertz Corp.*, 624 F.3d 537, 555 n.10 (2d Cir. 2010). So long as plaintiffs are similarly situated, they can join a § 216(b) action regardless of whether it is certified.

Given this prelude, the discrete issue here is conditional certification. "When deciding whether to certify a collective action pursuant to the FLSA, courts generally follow a two-stage process." *Butler v. DirectSAT USA, LLC*, 876 F. Supp. 2d 560, 566 (D. Md. 2012). "In the first stage, commonly referred to as the notice stage, the court makes a 'threshold determination of whether the plaintiffs have demonstrated that potential class members are similarly situated, such that court-facilitated notice to the putative class members would be appropriate.'" *Id.* (quoting

5

*Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, 686 (D. Md. 2010) (internal quotation marks omitted)). "In the second stage, following the close of discovery, the court conducts a 'more stringent inquiry' to determine whether the plaintiffs are in fact 'similarly situated,' as required by § 216(b)." *Id.* This case resides at the first stage. And thus the crux of the present matter is whether the plaintiffs have proffered enough for the court to make the threshold determination that they are similarly situated to a group of potential plaintiffs. The FLSA does not set its own guidelines for when employees are similarly situated. Nor has the Fourth Circuit squarely addressed the issue. But district court authority in this circuit abounds, as does direction from other circuit courts.

Similarly situated does not mean identical. *Bouthner v. Cleveland Constr., Inc.*, 2012 WL 738578, at *4 (D.Md. Mar. 5, 2012)[3] (citing *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1217 (11th Cir. 2001)). Instead, a "group of potential FLSA plaintiffs is 'similarly situated' if its members can demonstrate that they were victims of a common policy, scheme, or plan that violated the law." *Butler*, 876 F. Supp. 2d at 566. To satisfy their burden at this stage, the plaintiffs must make "a relatively modest factual showing" that such a common policy, scheme, or plan exists. *Randolph v. PowerComm Const., Inc.*, 7 F. Supp. 3d 561, 575 (D. Md. 2014) (internal quotation marks omitted). "Mere allegations in the complaint are not sufficient; some factual showing by affidavit or otherwise must be made." *Camper v. Home Quality Mgmt. Inc.*, 200 F.R.D. 516, 519 (D. Md. 2000). Employees cannot reasonably be expected, however, to have evidence of a stated policy of refusing to pay overtime. *Quinteros*, 532 F. Supp. 2d at 772. At the first stage of certification, or, the "notice stage," courts do not delve into the merits; instead, a "plaintiff must only present a similar legal issue as to coverage, exemption, or nonpayment of minimum wages or overtime arising from at least a manageably similar factual

---

[3] Unpublished cases are cited not for their precedential value but for the persuasiveness of their reasoning.

setting with respect to their job requirements and pay provisions." *Shaver v. Gills Eldersburg, Inc.*, 2015 WL 5897463, at *9 (D. Md. Oct. 6, 2015). Because certification can be withdrawn at the second stage should discovery fail to establish the plaintiffs' similarly-situated status, courts have described the notice stage as requiring only a "minimal evidentiary showing" and as less demanding than the "final decision regarding the propriety of proceeding as a collective action." *Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 300 (D. Md. 2007); *see also Gionfriddo v. Jason Zink, LLC*, 769 F. Supp. 2d 880, 886 (D. Md. 2011) (noting that the "second, more 'stringent' phase of collective action certification under the FLSA is often prompted by a defendant's filing of a motion to decertify, and is often referred to as the 'decertification stage.'")

### 1. The Scope of the Class to be Certified

In this case, the plaintiffs have made the requisite modest factual showing that they are similarly situated to at least some other security personnel and that they were subject to a common policy, scheme, or plan concerning overtime. Certainly, Lieutenants, Captains, and Majors working for SSS all appear to have been subject to the same overtime policy. In fact the defendant concedes as much—contending that these personnel are exempt from the FLSA's overtime requirements altogether. (Def.'s Opp'n, ECF No. 18 at p. 6 n.3). And while it proceeds to argue that the respective job descriptions and employment duties attached to these positions are sufficiently disparate to destroy their similarly-situated status, there is at least enough similarity among their duties as to provide the requisite "manageably similar factual setting" to justify conditional certification at this early stage. *See Shaver*, 2015 WL 5897463, at *9; *see also De Luna-Guerrero v. N. Carolina Grower's Ass'n, Inc.*, 338 F. Supp. 2d 649, 654 (E.D.N.C. 2004) (quoting Kearns, *The Fair Labor Standards Act*, § 18.IV.D.3.). Indeed, while the employees' responsibilities on the job are important to this analysis, the touchstone inquiry is the

potential plaintiffs' common relationship to the allegedly unlawful policy. *Randolph*, F. Supp. 3d at 575. Here, the potential plaintiffs in the putative class have the same relationship to the policy in question.

As noted above, there is some inconsistency in and between the plaintiffs' declarations concerning the threshold at which the alleged policy was applied. Some plaintiffs recite an $11.36 hourly wage as the triggering event, noting that this amount coincides with the rank of Lieutenant, while others claim that the overtime policy applied to all employees. In their motion for conditional certification, the plaintiffs ask this court to certify a class of all BSI security personnel, but then proceed to describe the alleged policy as one "whereby Broadway stopped paying their employees overtime when they reached a pay-rate of approximately $11.36/hour." (ECF No. 15 at p. 11). They continue: "[s]ome declarations implied that this pay-rate coincided with achieving the rank of Lieutenant, but at least one . . . stated that Sergeants were also not paid overtime." (*Id.*) Thus, while attempting to draw the line between Sergeants and Lieutenants may muddle the issue, all the plaintiffs agree that employees making $11.36 and above were subject to the alleged policy. Indeed, after asking for blanket certification, the plaintiffs contend that "Broadway's policy seemed to hinge on hourly wage rather than rank." (ECF No. 15 at p. 14). Not only is there markedly less support in the plaintiffs' declarations for an overtime policy applying to all employees, but such a policy would contravene the plaintiffs' own stated theory of the policy and the descriptions of the two long-time employees who were promoted across the $11.36 line in question. Thus, at this juncture, there is an insufficient factual basis upon which to certify a class that includes employees who never made $11.36 or more an hour. By contrast, the consistent description of an overtime policy applied to employees making $11.36 or more an hour is sufficient to cross the minimal factual threshold for conditional certification.

8

The next question is whether certification should be limited to SSS employees or whether to extend it to CS personnel making more than $11.36 an hour. The defendant insists that SSS and CS are distinct corporate divisions with different management structures and different pay scales. At one point, in the McNamee affidavit, the assertion is made that CS clients set their own pay rates for the security personnel provided by BSI. (*See* McNamee Aff. at ¶ 22, ECF No. 18-1). Needless to say, if BSI had no part in setting the pay rates of these officers or paying these officers, they would not be similarly situated to the present plaintiffs, even for purposes of conditional certification. In its Opposition however, the defendant merely asserts that CS personnel—those, as it happens, who work at the Johns Hopkins locations—have different job duties, supervision structures, and compensation rates. (Def.'s Opp'n, ECF No. 18 at pp. 6-7). It does not invoke Mr. McNamee's contention that these officers were paid at a rate set by a third-party institution. The CS division provides security to two of the seven known locations where BSI provides security personnel, and it would appear that the lion's share of officers provided hold the rank of Security Officer. (Pls.' Reply, ECF No. 19 at p. 3). These employees are listed as BSI employees in its annual newsletter and are given accolades to the tune of "Broadway's Best." (*See, e.g.*, ECF No. 15-11). The plaintiffs point out that there is no mention of separate security divisions within BSI promotional materials or their newsletter, and, instead, there is mention of a singular security division "known as Silver Star Security." (Pls.' Reply, ECF No. 19 at p. 3). While the parties spar over this issue, neither brings much to fight with into the arena. There is a conspicuous dearth of information in the materials submitted by both parties about any such division within BSI security operations.

This purported corporate partition however, may ultimately be less consequential than the parties surmise. To begin, there remains an insufficient factual basis upon which to include

9

employees who have never surmounted the $11.36 threshold. Thus, if the defendant's contention that only Security Officers are provided to CS clients is true, and only Lieutenants and their superiors make above $11.36, there may not be CS personnel who would otherwise be included. On the other hand, if the compensation levels are different, there may be CS personnel who would otherwise qualify. Illuminating the contours of these divisions is just the purpose of discovery. And while this court will not approve a fishing expedition into areas where there is *de minimis* evidence of a common policy, notice should reach potential plaintiffs who may have been subjected to the common overtime policy—a policy for which the requisite modest factual showing has been met.

Thus mindful of the early stage of this litigation and the conflicting accounts of BSI security operations, the court will conditionally certify a potential class with the following parameters: (1) All Silver Star Security personnel who have achieved the rank of Lieutenant, Captain, or Major, and any other Silver Star Security personnel who, in their tenure with BSI, made $11.36 or more an hour; (2) any other security personnel, CS personnel or otherwise, employed by and paid by BSI who have, in their tenure with BSI, made $11.36 or more an hour. In both cases, certification is limited to those who have made $11.36 or more in any pay period postdating January 10, 2012 and predating the attached order.

### 2. Methods and Content of Court-Assisted Notification

The plaintiffs have requested court assistance in notifying potential class members via email, mail, and text message. Specifically, they seek an order requiring the defendant to supply the plaintiffs' counsel with "the first, middle, and last name of each person who held such position, the position(s) held, the person's mailing address, all cellular telephone numbers,

addresses on record, all email addresses on record, and the dates of the person's employment with Defendant." (Pls. Mot., ECF No. 15 at p. 16). The court will not order more extensive notification than is necessary to reach potential class members. *See Arnold v. Acappella*, LLC, 2016 WL 5454541, at *4 (D. Md. Sept. 29, 2016) (declining to order production of class members' telephone numbers absent showing of "special circumstances to necessitate such production") (citing *McFeeley v. Jackson St. Entm't, LLC*, 2012 WL 5928902, at *5 n.2 (D. Md. Nov. 26, 2012); *Arevalo v. D.J.'s Underground*, 2010 WL 4026112, at *2 (D. Md. Oct. 13, 2010)).

Initially, the court will only order notice via email and mail. If the initial notice receives a large number of undeliverable responses, the court may order a second round of notice via text message or another method to ensure potential class members are notified. The court appreciates the variety of communication channels used in the modern era but would simultaneously seek to strictly limit initial communications with potential plaintiffs to the official notice procedures and court-approved language. Barring phone numbers, the balance of employee information requested is to be turned over. Email addresses change, as do physical addresses—and thus plaintiffs should be given the full scope of such information on file. The parties now agree that the defendant will be given 21 days to compile the names, addresses, and e-mail addresses of conditional class members. The opt-in period for class members will be 90 days, as requested by the plaintiffs. *See Butler*, 876 F. Supp. 2d at 575 (listing ninety day opt-in periods authorized by numerous courts).

The plaintiffs filed a proposed notice to class members and the defendant did not propose an alternative notice. They did, however, raise a number of objections to the plaintiffs' proposed notice. Many of the objections are resolved by the parameters imposed on the conditional

certification above, and the drafted notice to potential class members should be edited to be consistent with these specifications. Once these edits take effect, the parties are directed to confer on the remaining content and dissemination of the notice. Any remaining disagreements will then be resolved by the court.

A separate order follows.

9/17/2018
Date

/s/ CCB
Catherine C. Blake
United States District Judge