**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| **HENRY L. BLAKE JR.,** *et al.*, | * | |
| **Plaintiffs,** | * | **Civil Action No.: 1:18-cv-00086-SAG** |
| **v.** | * | |
| **Broadway Services, Inc.,** | * | |
| **Defendant.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OF LAW IN SUPPORT OF**
<u>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

Respectfully submitted,

<u> /s/ Kevin C. McCormick           </u>
Kevin C. McCormick (Bar No. 07674)
Kyle Y. Dechant (Bar No. 20763)
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1626
Tel.    (410) 347-8700
Fax     (410) 223-4379
kmccormick@wtplaw.com
kdechant@wtplaw.com
*Counsel for Defendant Broadway Services, Inc.*

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

    BSI's Security Services and the Role of Majors in the Provision of Security Service
Operations ................................................................................................................... 2

    Plaintiffs' Management and Supervisory Responsibilities at Account Sites ............ 4

    BSI's Use of an Hourly "Home-Rate" in Its Payroll System.................................... 5

    Plaintiffs' Receipt of Guaranteed Salaries and Enhanced Employee Benefits as Exempt
Salaried Employees .................................................................................................... 6

LEGAL STANDARD...................................................................................................... 9

ARGUMENT ................................................................................................................. 10

I.    Plaintiffs Were Exempt Employees Under the FLSA as They Satisfied Both the Primary
Duties Test and the Salary Basis Test for Bona Fide Executives.......................... 10

    A.    Plaintiffs Satisfied the Primary Duties Test for Bona Fide Executives. ...... 12

        1.    Plaintiffs' Primary Duty Was Management.................................... 12

        2.    Plaintiffs Directed Two or More Other Employees. ....................... 15

        3.    Plaintiffs' Suggestions and Recommendations as to the Hiring, Firing,
Advancement, Promotion or Any Other Change of Status of Other
Employees Were Given Particular Weight. .................................... 16

        4.    That Plaintiffs May Have Performed Duties of Non-Exempt Employees in
Addition to the Duties They Performed as Bona Fide Executives Does Not
Violate the Primary Duties Test..................................................... 19

    B.    Plaintiffs Satisfy the Salary Basis Test. .................................................... 21

        1.    Plaintiffs Were Paid on a Salary Basis As Plaintiffs Received a
Predetermined Weekly Base Salary Even When They Worked Less Than
40 Hours a Week. .......................................................................... 21

        2.    BSI's Use of An Hourly Rate System in Calculating Plaintiffs' Weekly
Base Salary Does Not Violate the Salary Basis Test. ..................... 25

        3.    Plaintiffs' Weekly Base Salaries Satisfy the "Reasonable Relationship"
Test................................................................................................ 30

II.   In the Alternative, Any FLSA Violations, If Proven, Were Not Willful and Therefore
      Subject to a Two, Not Three Year Statute of Limitations, and BSI's Good Faith and
      Reasonable Grounds for Believing Its Pay Practices Complied with Applicable Law
      Preclude an Award of Liquidated Damages. ........................................................................ 32

      A.    Any FLSA Violations, If Proven, Were Not Willful and Therefore Subject to a Two,
            Not Three Year Statute of Limitations. ....................................................................... 32

      B.    Defendant Good Faith and Reasonable Grounds for Believing Its Pay Practices
            Complied with Applicable Law Thus Precluding an Award of Liquidated Damages. 34

      CONCLUSION.......................................................................................................................... 35

# **TABLE OF AUTHORITIES**

**Cases**

*Acs v. Detroit Edison Co* ................................................................................ 28, 29, 30

*Aerotek, Inc. v. Obercian*, 377 F. Supp. 3d 539 (D. Md. 2019) ............................... 9, 10

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ................................................ 9

*Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514 (4th Cir. 2003) ................... 9, 10

*Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336 (4th Cir. 1994) .......................... 34

*Chao v. Self-Pride, Inc.*, 232 Fed. Appx. 280 (4th Cir. 2007) .................................... 33

*Counts v. S.C. Elec. & Gas Co.*, 317 F.3d 453 (4th Cir. 2003) ................................... 11

*Dash v. Mayweather*, 731 F.3d 303 (4th Cir. 2013) ................................................ 10

*Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639 (4th Cir. 2002) ................ 9

*Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351 (4th Cir. 2011) ........... 33

*Drewitt v. Pratt,* 999 F.2d 774 (4th Cir. 1993) ..................................................... 9

*Encino Motorcars, LLC v. Navarro,* 138 S. Ct. 1134 (2018) ................................... 10

*Garcia v. Frog Island Seafood, Inc.,* 644 F. Supp. 2d 696 (E.D.N.C. 2009) .............. 35

*Grace v. Family Dollar Stores, Inc. (In re Family Dollar FLSA Litig.)*, 637 F.3d
    508 (4th Cir. 2011) ........................................................................... 19, 20

*Graves v. Lioi*, 930 F.3d 307 (4th Cir. 2019) ..................................................... 9

*Kulish v. Rite Aid Corp.*, No. 11-3178, 2012 U.S. Dist. LEXIS 176760 (D. Md.
    Dec. 13, 2012) .......................................................................... 25, 26, 27, 29

*Lovo v. Am. Sugar Ref., Inc.*, No. 17-418, 2018 U.S. Dist. LEXIS 139543 (D. Md.
    Aug. 17, 2018) .............................................................................. 11, 12

*Masters v. Huntington*, 800 F. Supp. 363 (S.D. W. Va. 1992) ......................... 25, 26, 29

*Mayhew v. Wells*, 125 F.3d 216 (4th Cir. 1997) ............................................. 34

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988) ............................... 32, 33

*Nevada v. United States DOL*, 275 F. Supp. 3d 795 (E.D. Tex. 2017) ............... 11

*Roy v. County of Lexington,* 141 F.3d 533 (4th Cir. 1998) ............................................. 35

*West v. Anne Arundel Cty.*, 137 F.3d 752 (4th Cir. 1998) ....................................... 25, 26

*Young v. Prince George's County*, 355 F.3d 751 (4th Cir. 2004) ................................. 9

**Statutes**

29 U.S.C. § 207(a)(1) ......................................................................................... 10, 19

29 U.S.C. § 213(a)(1) ............................................................................................... 10

29 U.S.C. § 255(a) ................................................................................................... 32

29 U.S.C. § 260 ....................................................................................................... 34

**Other Authorities**

*DOL Wage and Hour Opinion Letter*, No. FLSA-2018-25, (November 8, 2018) ...................... 31

**Rules**

Fed. R. Civ. P. Rule 56(a) ......................................................................................... 9

**Regulations**

29 C.F.R. § 541 ................................................................................................... 11, 34

29 C.F.R. § 541.100 ................................................................................. 11, 12, 16, 19

29 C.F.R. § 541.100(a)(2) ........................................................................................ 12

29 C.F.R. § 541.100(a)(4) ........................................................................................ 16

29 C.F.R. § 541.102 ......................................................................................... 13, 14, 20

29 C.F.R. § 541.105 ................................................................................................. 16

29 C.F.R. § 541.106 ................................................................................................. 19

29 C.F.R. § 541.600 ................................................................................................. 11

29 C.F.R. § 541.602 ................................................................................................. 21

29 C.F.R. § 541.604 ................................................................................................... 5

29 C.F.R. § 541.604(a) ............................................................................................. 30

29 C.F.R. § 541.604(b) ......................................................................................... 30, 31

## **APPENDIX OF EXHIBITS**

Exhibit A:   Plaintiff's Response  (Answers) to Defendant's First Set of Interrogatories (by Henry Blake)

Exhibit B:   Plaintiff's Response (Answers) to Defendant's First Set of Interrogatories (by Frank LeRoy)

Exhibit C:   Plaintiff's Response (Answers) to Defendant's First Set of Interrogatories (by Sean Robinson)

Exhibit D:   Deposition Transcript of Henry Blake, October 21, 2019

    Exhibit D1:   Declaration of Henry L. Blake, Jr.

    Exhibit D2:   Long-Term Disability Election Form (signed by Henry Blake)

    Exhibit D3:   Email from Henry Blake to Jack Long, January 26, 2015

    Exhibit D4:   Email from Henry Blake to Jack Long, August 21, 2015

    Exhibit D5:   Email from Henry Blake to Jack Long, February 18, 2016

    Exhibit D6:   Email from Henry Blake to Jack Long, September 13, 2016

    Exhibit D7:   Email from Henry Blake to Jack Long, April 11, 2017

    Exhibit D8:   Employee Timecard History Report of Henry Blake: 01/03/2015–04/20/2018

Exhibit E:   Deposition Transcript of Frank LeRoy, October 25, 2019

    Exhibit E1:   Employee Benefit Enrollment Form (signed by Frank LeRoy)

    Exhibit E2:   Exempt Employee Performance Evaluation (of Frank LeRoy), February 22, 2013

    Exhibit E3:   Exempt Employee Performance Evaluation (of Frank LeRoy), February 4, 2015

    Exhibit E4:   Employee Timecard History Report of Frank LeRoy: 01/03/2015–08/10/2019

Exhibit F:   Deposition Transcript of Sean Robinson, October 21, 2019

    Exhibit F1:   Declaration of Sean Cory Robinson

Exhibit G:     Deposition Transcript of Peter Seidl, October 29, 2019

Exhibit H:     Deposition Transcript of Jack Long, October 29, 2019

Exhibit I:     Deposition Transcript of Brentina Horshaw, October 29, 2019

Exhibit J:     Employee Timecard History Report of Sean Robinson: 01/02/2015–01/05/2018

Exhibit K:     Handbook Acknowledgement (signed by Henry Blake)

Exhibit L:     BSI Employment Handbook (Salaried)

Exhibit M:     Employee Benefit Enrollment Form (signed by Sean Robinson)

Exhibit N:     Exempt Employee Performance Evaluation (of Sean Robinson), March 29, 2006

Exhibit O:     Exempt Employee Performance Evaluation (of Sean Robinson), June 15, 2009

Exhibit P:     Affidavit of P. Michael Kastendike, December 11, 2019

Exhibit Q:     Job Description for Major

Exhibit R:     Defendant, Broadway Services, Inc.'s, Answers to Plaintiffs' First Set of
               Interrogatories

## INTRODUCTION

Defendant, Broadway Services, Inc. ("BSI", "Broadway", or "Defendant"), by its undersigned attorneys, hereby submits this *Memorandum of Law in Support of Defendant's Motion for Summary Judgment* (the "Memorandum") in support of its *Motion for Summary Judgment* (the "Motion").

By its Motion, Defendant seeks entry of judgment in its favor on the Plaintiffs' *Amended Collective Action Complaint* (the "Amended Complaint"), alleging overtime violations under the Fair Labor Standards Act ("FLSA"). In the alternative, Defendant requests that this Court find that the FLSA's two-year statute of limitations should be applied, and that no liquidated damages be awarded in this case.

The three Plaintiffs in this action, Henry L. Blake Jr., Frank A. LeRoy, Jr., and Sean C. Robinson (collectively, the "Plaintiffs",[1] and individually, "Blake", "LeRoy", and "Robinson"), worked for BSI at the rank of Major during the time period relevant to this case.

On February 20, 2019, Blake and two additional Plaintiffs filed an *Amended Collective Action Complaint* [Dkt. No. 9]. On March 22, 2018, Plaintiffs filed *Plaintiffs' Motion to Conditionally Certify a FLSA Collective Action and for Approval of and Facilitation of Notice to Potential Class Members* [Dkt. No. 15] (the "Motion to Conditionally Certify a FLSA Collective Action"); Defendant filed its opposition thereto [Dkt. No. 18] on April 12, 2018.

On September 13, 2018, this Court issued a *Memorandum* [Dkt. No. 20] and *Order* [Dkt. No. 21], granting in part and denying in part, the Motion to Conditionally Certify a FLSA Collective Action. On November 6, 2018, this Court issued an *Amended Order*, clarifying the parameters of the class certification, limiting the action's relevant time period to pay received

---

[1] Throughout the Introduction and elsewhere, "Plaintiffs" also refers to the then-named plaintiffs, existing at the time of the proceeding that is discussed.

post-dating January 10, 2015, and setting a 90-day deadline for conditional class members to opt into the suit.

Prior to the end of the 90-day deadline, 24 class members (including the three plaintiffs originally named in the *Amended Complaint*) opted into the class action suit. *See Joint Status Report* [Dkt. No. 46] ¶ e. Included in the 24 opt-in Plaintiffs were: Sergeants, Lieutenants, Captains, and three Majors. After engaging in a series of settlement negotiations, the parties were able to successfully resolve the claims of all but the three remaining Plaintiffs; all of whom held the ranking of Major for the relevant time period. *Id.*

As discovery for this case has been completed and, as demonstrated more fully below, there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law, Defendant seeks entry of summary judgment in its favor and for reasons states as follows:

## STATEMENT OF FACTS

BSI, a Maryland corporation, employs over 1500 individuals and offers a variety of services, including property and facility management, shuttle, transport and parking services, janitorial services, and commercial security and concierge services to businesses, municipalities, hospitals, and universities in the Baltimore/Washington, D.C. area.

### BSI's Security Services and the Role of Majors in the Provision of Security Service Operations

The three Plaintiffs in this case were employed in BSI's Silver Star Security ("SSS") Division, one of two security divisions at BSI, which provides commercial security and concierge services at locations throughout the region, including Annapolis Towne Centre, Woodmore Town Center, Howard County General Hospital, Laurel Regional Hospital, and Prince George's County Hospital.

Depending on the size, location, and security needs of a particular account site, the number of BSI security personnel needed to manage, staff, and patrol a site location varies.  To facilitate efficient and orderly management and provision of security services, BSI employs a hierarchical command structure within the SSS division, similar to that of military, police, or firefighting units.  Starting with the lowest ranking employees, the security personnel include: Security Officers, Sergeants, Lieutenants, Captains, and Majors.  In addition to these personnel designations being used in security service operations, BSI's Human Resources Department uses the designations in carrying out its employment policy, including exempt and non-exempt status classifications and procedures applying to such classifications.

The highest ranking officer present at an account site is typically a Major.[2]  As such, a Major is in charge of managing and overseeing the provision of security services at a particular account site.  *See* Job Description for Major (Ex. Q); *see also* Blake Dep. (Ex. D), 10:2-10; LeRoy Dep. (Ex. E), 8:6–10:18, 45:7–13; Robinson Dep. (Ex. F), 7:22–9:21.  Additionally, as the highest ranking officer present at an account site, a Major serves as the initial point-of-contact between BSI and the client.  *See* Long Dep. (Ex. H), 25:13–26:6; *see also* Job Description for Major (Ex. Q); accordingly, Majors are often also referred to as "Account Managers" in the security division.  Long Dep. (Ex. H), 20:3–9.  A Major's duties include giving direction, training, and guidance to all security personnel working at a particular account site. *See* Job Description for Major (Ex. Q).  A Major also supervises the coordination, preparation, and file maintenance of work schedules, daily activity reports, time sheets, negative time sheets, disciplinary forms, personnel transaction forms, and payroll adjustments; a Major receives and reviews all applications for hiring at a site, and is also tasked with the termination of any

---

[2] Depending on the service needs of clients and staffing fluctuations, Lieutenants, Captains, or Assistant Directors may also serve as the highest ranking officer on site at an account site location.

personnel that does not meet BSI's policy and standards. *See id.*; *see also infra* Memorandum § I.A.1. (quoting Plaintiffs' own descriptions of their work duties as Majors). Additionally, Majors assist in conducting uniformed patrols of their respective account sites. *See id.*

### *Plaintiffs' Management and Supervisory*
### *Responsibilities at Account Sites*

The three remaining Plaintiffs in this action, Blake, LeRoy, and Robinson, worked for BSI at the ranking of Major, during the time period relevant to this case. *See* Blake Dep. (Ex. D), 9:21–10:1; LeRoy Dep. (Ex. E), 7:22–8:2; Robinson Dep. (Ex. F), 7:9–8:4. Blake was the Major (also commonly referred to as "Account Manager") in charge of security operations at the Annapolis Towne Centre site from February 2014 to April 2018, where he supervised approximately 10 other security personnel. *See* Blake Dep. (Ex. D), 8:18–21, 10:2-10, 11:16–12:1; Seidl Dep. (Ex. G), 65:18–20; Long Dep. (Ex. H), 25:21–26:6. In his own words, Blake described that his "job duties at Broadway include supervising the officers working at the Annapolis Towne Centre, creating work schedules, directing traffic, investigating minor incidents, helping with crowd control, and performing general security duties." Blake Decl. (Ex. D1) ¶ 6.

LeRoy began working at BSI in 2002. LeRoy Dep. (Ex. E), 7:17–19. For the relevant time period (pay received post-date January 10, 2015), LeRoy was the Major/Account Manager in charge of security operations at the Mount Washington Campus and multiple Keswick account sites, where he supervised approximately 29 other security personnel; he also managed the administrative duties for the College of Engineering at the Johns Hopkins University account site. *See* LeRoy Dep. (Ex. E), 8:6–10:18, 45:7–13; LeRoy Ans. (Ex. B) ¶ 5. LeRoy described his day-to-day duties as: "assisting with payroll and scheduling, occasionally doing rounds on the work site, training, manning the command center, answering telephone calls and emails, doing

access control, monitoring CCTV, monitoring alarms, updating daily logs and activity logs, writing reports, conducting investigations, and the like." LeRoy Ans. (Ex. B) ¶ 5.

Robinson worked at BSI from 1998 to December 2017. Robinson Dep. (Ex. F), 7:3–5. For the relevant time period, Robinson was the Major/Account Manager in charge of security operations at the Bowie Health Center and Prince George's Hospital Center sites, where he supervised approximately 50 other security personnel. *See* Robinson Dep. (Ex. F), 7:22–9:21. Robinson stated, "My job duties at Broadway involved overseeing the security staff, assisting with scheduling and payroll, training new and junior employees, assisting with the hiring and firing of employees, responding to emergency calls, and conducting foot patrols and general security work as need. Robinson Decl. (Ex. F1) ¶ 5.

### *BSI's Use of an Hourly "Home-Rate" in Its Payroll System*

BSI employees over 1500 full and part-time employees.  Approximately, 55 are exempt salaried employees and 1445 are non-exempt hourly employees.  In addition to non-exempt hourly employees receiving FLSA-required overtime pay (at one and one-half times the normal rate), many of BSI's exempt salaried employees also receive overtime pay, although at a straight-time hourly rate, which is permitted under FLSA regulation. *See* 29 C.F.R. § 541.604 (Minimum guarantee plus extras.) ("An employer may provide an exempt employee with additional compensation with losing the exemption or violating the salary basis requirement . . . .  Such additional compensation may be paid on . . . straight-time hourly amount . . . .").

In order to accommodate, the various the classifications of its 1500 full and part-time employees, as well as to track PTO accrual and usage, BSI issues to all 1500 employees—from the CEO on down to part-time hourly employees—an hourly "home-rate," which is integrated into BSI's payroll system.  Seidl Dep. (Ex. G), 24:2–6.  All exempt salaried employees,

including Plaintiffs, are paid a guaranteed, weekly base salary (*i.e.*, a standard 40-hour workweek multiplied by an employee's home-rate) even if they work less than 40 hours in a particular workweek.   In fact, BSI has a policy of ***allowing salaried employees to accrue negative PTO balances*** (hereinafter, "Negative PTO Accrual Policy"), so that exempt salaried employees are guaranteed receipt of their weekly base salaries even when they miss time from work while not having sufficient accrued PTO time to cover the absence.   Seidl Dep. (Ex. G), 44:4–45:7 ("We would let him go negative on paid time off.") (describing that exempt employees can accrue negative PTO balances to receive pay for 40 hours each week even when they have not accrued sufficient PTO); Horshaw Dep. (Ex. I), 41:2–3 ("And [if] he didn't have the time in the bank, he would still receive the PTO time."); Long Dep. (Ex. H), 60:17–18 ("We go negative for them and make sure that they get their 40 hours.").

### Plaintiffs' Receipt of Guaranteed Salaries and Enhanced Employee Benefits as Exempt Salaried Employees

For the time period relevant to this case, Plaintiffs' home-rates, annual salaries, and weekly base salaries were:

|  | Home-Rate ($/hr.) | Annual Salary | Weekly Base Salary |
|---|---|---|---|
| Henry L. Blake, Jr. (01/10/15 – 10/31/15) | $19.00 | $39,520.00 | $760.00 |
| (11/01/15 – 04/15/18) | $21.00 | $43,680.00 | $840.00 |
| Frank A. LeRoy, Jr. | $22.10 | $45,968.00 | $884.00 |
| Sean C. Robinson | $20.77 | $43,201.60 | $830.80 |

As BSI instructed Plaintiffs that weekly timesheets should have at least 40 hours of recorded time, Plaintiffs received payment of their weekly base salaries even in instances when Plaintiffs worked less than 40 hours a week.   *See* Blake Dep. (Ex. D), 33:3–18 ("I know PTO time was -- I had to take that time to get my 40 hours.") (confirming that PTO time was used to record at least 40 hours on weekly timesheets when he worked less than 40 hours in workweek,

and that he was not aware of any workweeks "that [he] didn't get paid for at least 40 hours times [his] home rate"); LeRoy Dep. (Ex. E), 31:12–18 (responding affirmatively to following questions: "But you never worked less than 40 hours?", and "And even in workweeks when you didn't work 40 hours, you got paid the 40 hours?); Robinson Dep. (Ex. F), 21:15–22:6 (confirming that he either worked at least 40 hours per workweek or PTO was used to fill in time to record at least 40 hours on weekly timesheets). Not once—out of the 468 weekly pay periods applicable to Plaintiffs' suit—did any of the Plaintiffs receive less than his weekly base salary even when Plaintiffs worked less than 40 hours a week. *See* Emp. Timecard History Report of Henry Blake: 01/03/2015–04/20/2018 (Ex. D8); Emp. Timecard History Report of Frank LeRoy: 01/03/2015–08/10/2019 (Ex. E4); Emp. Timecard History Report of Sean Robinson: 01/02/2015–01/05/2018 (Ex. J).[3]  Also, all instances of PTO usage by Plaintiffs were voluntary elections made by Plaintiffs; at no time did BSI instruct Plaintiffs to use PTO because their services were not needed. *See* Blake Dep. (Ex. D), 36:6–7 (confirming he was never forced to use PTO); LeRoy Dep. (Ex. E), 23:6–12 (same); Robinson Dep. (Ex. F), 21:6–9 (same).

Blake was informed of his exempt salaried status at orientation. As Brentina Horshaw, Vice President of Human Resources, explained in deposition:

> First, a salary employee is usually pulled out to the side when they're giving orientation instead of being in the room with all of the hourly employees. That's the first thing. They're pulled out separately. They're not in the normal orientation process.

---

[3] The 468 weekly pay periods applicable to this suit are each of the three Plaintiff's weekly pay periods, starting January 10, 2015, extending forward three-years from that date (*i.e.*, the three-year statute of limitations as determined by this Court. *See* Amended Order (Nov. 6, 2018) [Dkt. No. 22]). *I.e.*, 3 Plaintiffs * 3 Years * 52 Weeks/Year = 468 Applicable Weekly Pay Periods.

Likewise, each Plaintiff, in his Answers to Interrogatories, independently verified that his calculation of estimated damages was based on "156 weeks", s*ee* Blake Ans. (Ex. A) ¶ 4; LeRoy Ans. (Ex. B) ¶ 4; Robinson Ans. (Ex. C) ¶ 4, which together confirms the figure of 468 Applicable Weekly Pay Periods.

Second thing is that they're offered the handbook.  And they sign off on it, . . . If they're salary, they get salary; if they're hourly, they get an hourly handbook.

Horshaw Dep. (Ex. I), 28:5–15; *see also* Handbook Acknowledgement (signed by Henry Blake) (Ex. K); BSI Employment Handbook (specifying use for "SALARIED" employees).

Plaintiffs were also eligible to receive enhanced employee benefits not available to non-exempt hourly employees, such as additional PTO benefits, long-term disability benefits, and additional pension fund options.  *See* Horshaw Dep. (Ex. I), 28:16–29:1 ("Hourly employees receive one type of benefits, salary employees receive additional benefits.  That being PTO accrual, that being the long-term disability, and the different type of pension fund."); *see also* Long-Term Disability Form (signed by Henry Blake) (Ex. D2) (indicating in bold, on the top-left of the page, that the benefit is for "SALARIED" employees; also stating in bold, "TO CALCULATE YOUR WEEKLY COST: MULTIPLY YOUR BASE ANNUAL SALARY BY .0059 AND DIVIDE BY 52") (emphasis in original).  Likewise, LeRoy and Robinson separately submitted and signed "Employee Benefit Enrollment Form(s)", which indicate in bold, on the top-left of the page that the form is for "SALARIED" employees.  *See* Employee Benefit Enrollment Form (signed by Frank LeRoy) (Ex. E1); Employee Benefit Enrollment Form (signed by Sean Robinson) (Ex. M).

Finally, Plaintiffs were reminded of their exempt salaried status upon receipt of their performance reviews, which unambiguously state in bold, large-print font that they are, "EXEMPT EMPLOYEE PERFORMANCE EVALUATION[S]", *see* Exempt Emp. Performance Evaluation (of Frank LeRoy), Feb. 2, 2013 (Ex. E2); Exempt Emp. Performance Evaluation (of Frank LeRoy), Feb. 4, 2015 (Ex. E3); Exempt Emp. Performance Evaluation (of Sean Robinson), Mar. 29, 2006 (Ex. N); Exempt Emp. Performance Evaluation (of Sean Robinson),

June 15, 2009 (Ex. O); Plaintiffs were also reminded of their salaried status, each week, when they filled their timesheets with at least 40 hours in order to receive their weekly base salary.

## LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court:

> shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat a summary judgment motion:

> By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986); *see also Graves v. Lioi*, 930 F.3d 307, 317 (4th Cir. 2019) ("[Plaintiff] must present more than a 'scintilla' of evidence to support her allegations."); *Young v. Prince George's County*, 355 F.3d 751, 755 (4th Cir. 2004) ("[A] mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.").

The court must "view the evidence in the light most favorable to … the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility", *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir. 1993)); *see also Aerotek, Inc. v. Obercian*, 377 F. Supp. 3d 539, 546 (D. Md. 2019) (same). "Furthermore, neither 'unsupported speculation' nor evidence

that is 'merely colorable' or 'not significantly probative' will suffice to defeat a motion for summary judgment . . . ."  Bouchat, 346 F.3d at 522; *see also Dash v. Mayweather*, 731 F.3d 303, 328–29 (4th Cir. 2013) ("If the plaintiff's evidence . . . is unduly speculative, 'merely colorable,' or 'not significantly probative,' summary judgment can be granted to the defendant notwithstanding the fact that the defendant bore the statutory burden of proof."); *Aerotek*, 377 F. Supp. 3d at 546 ("If the evidence presented by the nonmovant is merely colorable, or is not significantly probative, summary judgment must be granted.").

## ARGUMENT

I.      **Plaintiffs Were Exempt Employees Under the FLSA as They Satisfied Both the Primary Duties Test and the Salary Basis Test for Bona Fide Executives.**

The FLSA requires an employer to pay overtime compensation ("one and one-half times the regular rate") for time worked beyond 40 hours per workweek, unless the employee falls within one of the statute's many exemptions.  29 U.S.C. § 207(a)(1).  One such exemption includes those "employed in a bona fide executive, administrative, or professional capacity".  *Id.* § 213(a)(1).

In *Encino Motorcars, LLC v. Navarro*, the Supreme Court recently clarified that the FLSA exemptions should be weighed equally with the statute's overtime requirement rather than be construed narrowly.  *See* 138 S. Ct. 1134, 1142 (2018) ("Because the FLSA gives no 'textual indication' that its exemptions should be construed narrowly, 'there is no reason to give [them] anything other than a fair (rather than a 'narrow') interpretation.' . . . Th[e] exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement.  We thus have no license to give the exemption anything but a fair reading.") (internal citations omitted).

An employee is exempt as a bona fide executive, administrator, or professional if the employee satisfies both (1) the "primary duties" test and (2) "salary basis" test. *See Counts v.*

*S.C. Elec. & Gas Co.*, 317 F.3d 453, 455 (4th Cir. 2003) (adopting primary duties and salary basis test for determining whether exemption applies); *Lovo v. Am. Sugar Ref., Inc.*, No. 17-418, 2018 U.S. Dist. LEXIS 139543, at *18 (D. Md. Aug. 17, 2018) (same).  As a threshold matter, the exemption only applies if the employee is compensated at a base rate not less than $455 per week.  29 C.F.R. § 541.600.[4]

As to the bona fide executive exemption, in particular, Department of Labor ("DOL") regulation describes more fully:

   (a) The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:

      (1) Compensated on a salary basis at a rate of not less than $ 455 per week (or $ 380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

      (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

      (3) Who customarily and regularly directs the work of two or more other employees; and

      (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100 ("General rule for executive employees.").  Here, we see that Sub-section (a)(1) of the rule sets forth the salary basis test and that Sub-sections (a)(2)–(a)(4) contain three requirements for satisfying the primary duties test for bona fide executives.  29 C.F.R. § 541.100;

---

[4] This Memorandum quotes the minimum threshold of $455, as the decision in *Nevada v. United States DOL*, 275 F. Supp. 3d 795 (E.D. Tex. 2017), effected a nationwide, permanent injunction of the 2016 DOL regulation.  *Id.* at 808 ("The Court hereby concludes the Department's Final Rule described in 81 Fed. Reg. 32,391 is invalid."); *see also* John Bowden, *Texas judge strikes down Obama overtime rule*, THE HILL (Aug. 31, 2017, 3:57 PM), https://thehill.com/homenews/administration/348752-texas-judge-strikes-down-obama-overtime-rule.   Thus, all references to the 29 C.F.R. Part 541 quote or cite to current valid DOL regulation.

*see also Lovo*, 2018 U.S. Dist. LEXIS at *18–20 (describing salary basis test and three requirements derived from C.F.R. § 541.100).

### A.       Plaintiffs Satisfied the Primary Duties Test for Bona Fide Executives.

Pursuant to 29 C.F.R. § 541.100 (a)(2)–(a)(4), an employee satisfies the primary duties for bona fide executives if the employee fulfills the following three requirements: (1) Primary Duty of Management, (2) Directing Two or More Other Employees, and (3) Authority to Hire or Fire Other Employees (or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight). 29 C.F.R. § 541.100; *see also Lovo*, 2018 U.S. Dist. LEXIS at *19–20.

### 1.       Plaintiffs' Primary Duty Was Management.

DOL regulation requires that a bona fide executive's "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof . . . ." 29 C.F.R. § 541.100(a)(2). In their responses to Defendant's First of Interrogatories, each Plaintiff admitted that they had supervisory responsibilities over other BSI employees. *See* <u>Blake Ans.</u> (Ex. A) ¶ 13; <u>LeRoy Ans.</u> (Ex. B) ¶ 13; <u>Robinson Ans.</u> (Ex. C) ¶ 5.

At bar, it is undisputed that each Plaintiff was the highest ranking security officer in charge of operations of a particular account site or sites. Blake was the Major/Account Manager in charge of operations at the Annapolis Towne Centre site. *See* <u>Blake Dep.</u> (Ex. D), 10:2-10 (stating that he was "in charge of the site itself"); *see also* <u>Long Dep.</u> (Ex. H), 25:21–26:6 ("[Blake] did – ***he ran the site***. I mean, I wasn't there every day. So that's why I hire a Major, account manager to do that job. Because that's all of the way down in Annapolis. I'm all of the way up here in Baltimore.") (emphasis added); <u>Seidl Dep.</u> (Ex. G), 65:18–20 (". . . ***[Blake]'s the highest ranking person we have at that account. He's responsible for that account.***") (emphasis added). LeRoy was the Major/Account Manager in charge of operations at the Mount

Washington Campus and multiple Keswick account sites, and in his own words, also administratively supervised the College of Engineering at John Hopkins University.  LeRoy Dep. (Ex. E), 8:6–10:18 (describing work at Mount Washington Campus, Keswick, and College of Engineering); 45:7–13 (". . . *I'm a manager.*  I'm an officer.  . . .  I do all the same – when I work, yes, *I manage four sites*.  . . .") (emphasis added).  Robinson was the Major/Account Manager in charge of operations at the Bowie Health Center and Prince George's Hospital Center sites.  *See* Robinson Dep. (Ex. F), 7:22–9:21.  At deposition, Robinson testified that between the Bowie Health Center and Prince George's Hospital Center he supervised roughly 50 BSI employees; he further testified that he primarily worked on site at the Prince George's Hospital Center and would only go to the Bowie Health Center as needed, and when asked directly whether "[he] ultimately had the responsibility for both sites?", he affirmed his responsibility over both sites answering, "Yes."  Id.  Thus, based on each Plaintiff's own deposition testimony, and supported by the testimony provided by Defendant's designees, each Plaintiff acknowledges that he was the highest ranking security office in charge of operations of a particular enterprise or division within BSI, *i.e.*, the various account sites to which each Plaintiff was assigned.

Section 541.102 further describes that "management" may include, stating non-exhaustively:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution

13

of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102 ("Management.").

In addition to acknowledging that Plaintiffs were the highest ranking security officer responsible for security operations at various account sites, each Plaintiff, under sworn statement, described their duties as Majors consistent with general description of management set forth generally in Section 541.102.   In written declaration and answers to interrogatories, Blake described his job duties as follows:

> My job duties at Broadway include supervising the officers working at the Annapolis Towne Centre, creating work schedules, directing traffic, investigating minor incidents, helping with crowd control, and performing general security duties.

> My job duties included supervising the other employees at the site, processing payroll, helping the outside vendors that worked at the Towne Centre, scheduling, and performing general security duties.

<u>Blake Decl.</u> (Ex. D1) ¶ 6; <u>Blake Ans.</u> (Ex. A) ¶ 5.   In answers to interrogatories, LeRoy described:

> My duties include managing four locations at the Keswick work site along with several other work sites, managing the administrative duties for COE [College of Engineering at Johns Hopkins University], assisting with payroll and scheduling, occasionally doing rounds on the work site, training, manning the command center, answering telephone calls and emails, doing access control, monitoring CCTV, monitoring alarms, updating daily logs and activity logs, writing reports, conducting investigations, and the like.

<u>LeRoy Ans.</u> (Ex. B) ¶ 5.   In written declaration and answers to interrogatories, Robinson described:

> My job duties at Broadway involved overseeing the security staff, assisting with scheduling and payroll, training new and junior employees, assisting with the hiring and firing of employees, responding to emergency calls, and conducting foot patrols and general security work as need.

14

> My duties included hiring, employee retention, training, assisting with payroll, as well as doing rounds, monitoring CCTV video, and handling paperwork.

Robinson Decl. (Ex. F1) ¶ 5; Robinson Ans. (Ex. C) ¶ 5.

By their own words and under sworn statement, Plaintiffs describe their job duties as Majors consistent with the management functions set forth by the DOL and likewise affirm their role as the highest ranking security officer responsible for security service operations of a particular account site or sites. Therefore, it is undisputed Plaintiffs' primary duty was indeed management.

### 2.     Plaintiffs Directed Two or More Other Employees.

Second, each Plaintiff "customarily and regularly direct[ed] the work of two or more other employees". In sworn declarations, submitted separately by Blake and Robinson, both Plaintiffs state that there job duties included supervising other BSI employees. *See* Blake Decl. (Ex. D1), ¶ 6 ("My job duties at Broadway includes supervising the officers working at the Annapolis Towne Centre . . . ."); Robinson Decl. (Ex. F1), ¶ 5 ("My job duties at Broadway involved overseeing the security staff . . . ."). In deposition, LeRoy testified that "My primary job is to be at the command center and ***supervise that shift***." LeRoy Dep. (Ex. E), 10:17–18. When asked about the number of BSI employees they supervised, Blake, LeRoy, and Robinson independently testified, respectively:

> "All together it was ten."

> "Roughly 29."

> "Roughly, I would have to say about 50."

Blake Dep. (Ex. D), 12:1; LeRoy Dep. (Ex. E), 8:20; Robinson Dep. (Ex. F) 8:8. Accordingly, it is undisputed that Plaintiffs customarily and regularly directed the work of two or more other employees.

### 3. Plaintiffs' Suggestions and Recommendations as to the Hiring, Firing, Advancement, Promotion or Any Other Change of Status of Other Employees Were Given Particular Weight.

The final requirement set forth in 29 C.F.R. § 541.100 is that those employed in a bona fide executive capacity must have:

> the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a)(4).  Section 541.105 further states:

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

29 C.F.R. § 541.105 ("Particular weight.").

Although Plaintiffs dispute whether they had *final* authority to hire, fire, or promote other BSI employees, Plaintiffs' own statements prove that their suggestions and recommendations as to such personnel decisions were given particular weight.

In numerous emails to his own supervisor (Jack Long), Blake repeatedly informed Long of various personnel decisions Blake had made, including the hiring and firing of other BSI employees.[5]

- On January 26, 2015, Blake emailed Long (Ex. D3):

---

[5] All typographical and grammatical errors in following emails were made in the original.  Also, the email, dated February 18, 2016, originally appeared in "all caps" but has been reformatted for ease of reading.

> Yes I am making him [Adam Pye] a sergeant he became a sergeant when Elkins left I thought I put that in the paper and called you on it.

- On August 21, 2015, Blake emailed Long (Ex. D4):

> Jack this is to inform that Sgt. Long is not working out the way I thought he would, just about every day i get a complaint from Lt.Ward that he does not follow orders and is never where he is supose to be . . . , so I am having him replaced and have Rodger Parker coming in on monday for an interview. . . .

- On February 18, 2016, Blake emailed Long (Ex. D5):

> I will be hiring Mr. Kenneth Smith based on his pass experience as a security officer, he will be working here at the Annapolis Towne Centre as a security officer . . . .

- On September 13, 2016, after describing a disagreement Blake had with another, Blake told Long in email (Ex. D6):

> [Officer Chipriano] is being insubordinate by telling me that he not coming to work.so I told him that as of 9-13-16 his services are no longer needed here at the ATC."

- On April 11, 2017, Long emailed Blake, requesting (Ex. D7):

> . . . evaluations for Ibrihim and McQuire so I can get in the PTFs for promotion.

Likewise, LeRoy testified in deposition, "I have recommended people to be hired. I would interview applicants." LeRoy Dep. (Ex. E), 43:4–8 (responding to the following inquiry, "Now, in your role as the major on these jobs sites for these four locations, you would on occasion hire people or commend people to be hired?"). As to disciplining and discharging employees, LeRoy also stated, "Any person that I see is being – that needs to be terminated, I will consult normally with my director. I will fill out paperwork and send it to the corporate office. And I would assume the corporate office has the final say on whoever is terminated." Id.

at 44:13–18.   In response to being asked if he "could effectively recommend that someone be terminated", LeRoy answered, "Yes."   Id. at 44:19–21.

In his own sworn and written declaration, Robinson stated, "My job duties at Broadway involved overseeing the security staff, assisting with scheduling and payroll, training new and junior employees, ***assisting with the hiring and firing of employees***, . . ."   Robinson Decl. (Ex. F1) ¶ 5 (emphasis added).   In deposition Robinson contended, "I didn't fire anybody.   I would only recommend a termination.  . . .   [T]here was a person of higher authority than me that made that decision.", and as to hiring, Robinson stated that "I interviewed and commended hiring and then they were sent to Broadway for processing.   So the hiring process took place there.   We just recommended employees for hire."   Robinson Dep. (Ex. F) 10:7–11, 11:8–11.

However, despite Robinson's contention that he did not have final authority to hire or fire other BSI employees, Robinson admitted that BSI gave significant weight to his recommendations for these types of personnel decisions.   For instance, when asked whether "[his director] would act on [his] recommendation [of termination] in most cases?", Robinson replied, "Most cases.  Not all."   Id. at 10:21–22, 11:1, 11:5 (affirming immediately thereafter, "Yes." on whether his recommendation was followed in ***most cases***.).   When asked, "And when you would make a recommendation for hire, was that usually followed, if you interviewed someone and you said I like this guy and I think we should hire them?", Robinson also admitted, "Pretty much, yes."   Id. at 11:12–16.   Thus, based on their own sworn statements, it is clear that at a minimum, Plaintiffs' suggestions and recommendations as to the hiring and firing of employees were given weight sufficient to establish the hiring and firing requirement for bona fide executives.

**4.    That Plaintiffs May Have Performed Duties of Non-Exempt Employees in Addition to the Duties They Performed as Bona Fide Executives Does Not Violate the Primary Duties Test.**

As Plaintiffs' own statements demonstrate that their duties as bona fide executives satisfied the primary duties test (*i.e.*, their primary duty was management, they supervised two or more other employees, and their suggestions and recommendations as to hiring, firing, *etc.* of other employees were given particular weight)—Plaintiffs may argue that because they performed duties of non-exempt employees, such as general security duties or foot patrol, in addition to their duties as bona fide executives, the overall work they performed as Majors does not satisfy the primary duties test.   To the contrary, however, DOL regulation and precedent from the Fourth Circuit set forth:

> "Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met."

29 C.F.R. 541.106 (Concurrent duties.); *see*, *e.g.*, *Grace v. Family Dollar Stores, Inc. (In re Family Dollar FLSA Litig.)*, 637 F.3d 508 (4th Cir. 2011) (affirming district court's grant of summary judgment in favor of Family Dollar in action brought under FLSA despite plaintiff's argument that vast majority of time spent working was on non-executive tasks).

In *Family Dollar*, a former manager of a Family Dollar store, who worked 50–65 hours per week and was a paid fixed salary plus bonus, brought suit against Family Dollar under the FLSA for overtime wages.   637 F.3d at 510.   Her chief contention, as summarized by the court, was that "she was not subject to [the executive] exemption because she devoted the vast majority of her time to nonexecutive tasks and therefore should be paid wages on the basis of a 40-hour work week plus overtime, as required by 29 U.S.C. § 207(a)(1)."   *Id.*   In addition to acknowledging her managerial role and duties, the plaintiff also testified in her deposition:

19

> that her primary duty was freight and that she spent 95% of the time doing freight
> (doing it herself, not supervising other people doing it).   [She] also alleged that
> she spent 99% of the time during a week putting out freight, running a cash
> register, doing the schematics and doing the janitorial work.

*Id.* at 512.  Despite this deposition testimony and contention that "there comes a point when the degree of manual labor approaches 80-90% of the plaintiff's time that a genuine issue of material fact as to her 'primary duty' is created by that fact alone", *id.* at 514 (internal quotation marks omitted), the Fourth Circuit determined, "We conclude that Grace [the former manager] was performing management duties whenever she was in the store, even though she also devoted the most of her time to doing the mundane physical activities necessary for its successful operation." *Id.* at 516.

Like the plaintiff in *Family Dollar*, who as a store manager was in charge of operations at a Family Dollar store and as such performed management duties, each Plaintiff in this case—and by his admission—was a Major/Account Manager in charge of operations at an account site(s) and performed related management duties.  *See* <u>Blake Dep.</u> (Ex. D), 10:2-10 (stating that he was "in charge of the site itself"); <u>LeRoy Dep.</u> (Ex. E), 45:7–13 ("I wear the uniform.   ***I'm a manager.***  I'm an officer.  . . .  I do all the same – when I work, yes, ***I manage four sites***. . . .") (emphasis added); <u>Robinson Dep.</u> (Ex. F), 9:19–21 (responding, "Yes." to whether "[he] ultimately had responsibility for both sites"); *see also supra* Memorandum § I.B.1. (quoting each Plaintiff's own description of his job duties consistent with 29 C.F.R. § 541.102).  As such, that Plaintiffs may have also performed duties of non-exempt employees, such as general security duties or foot patrol, in addition to the duties they performed as bona fide executives does not violate the primary duties test.

Accordingly, Plaintiffs satisfied the primary duties test for bona fide executives, as each Plaintiff was in charge of operations at an account site(s) and performed related management

duties, supervised two or more other employees, and their suggestions and recommendations as

to the hiring, firing, *etc.* of other employees were given particular weight.   Likewise, that

Plaintiffs may have also performed duties of non-exempt employees in addition to the duties they

performed as bona fide executives does not violate the primary duties test.

**B.      Plaintiffs Satisfy the Salary Basis Test.**

DOL regulation, sets forth the general rule for the salary basis test:

> (a)  General Rule.  An employee will be considered to be paid on a
> "salary basis" . . . if the employee regularly receives each pay
> period on a weekly, or less frequent basis, a predetermined amount
> constituting all or part of the employee's compensation, which
> amount is not subject to reduction because of variations in the
> quality or quantity of the work performed.

29 C.F.R. § 541.602 (Salary basis.).

**1.      Plaintiffs Were Paid on a Salary Basis As Plaintiffs Received a
Predetermined Weekly Base Salary Even When They Worked Less
Than 40 Hours a Week.**

In this case, it is undisputed that each Plaintiff received a predetermined, weekly base

salary not subject to reduction because of variations in quality or quantity of work.  For the time

period relevant to this case, Plaintiffs' home-rates, annual salaries, and weekly base salaries

were:

|  | Home-Rate ($/hr.) | Annual Salary | Weekly Base Salary |
|---|---|---|---|
| Henry L. Blake, Jr. (01/10/15 – 10/31/15) | $19.00 | $39,520.00 | $760.00 |
| (11/01/15 – 04/15/18) | $21.00 | $43,680.00 | $840.00 |
| Frank A. LeRoy, Jr. | $22.10 | $45,968.00 | $884.00 |
| Sean C. Robinson | $20.77 | $43,201.60 | $830.80 |

By Plaintiffs' own admission, and critical to demonstrating that Plaintiffs' weekly base

salaries were, in fact, predetermined and guaranteed is that each Plaintiff received his weekly

base salary even in instances when Plaintiffs worked less than 40 hours in a week.  For example,

though Plaintiffs often scheduled themselves several overtime shifts per week, Plaintiffs weekly

base schedules consisted of shifts sufficient to meet a standard 40-hour workweek, *see* <u>Blake Decl.</u> (Ex. D1) ¶ 7 ("Each of us work a normal 40 hour per week schedule . . . ."); <u>LeRoy Ans.</u> (Ex. B) ¶ 5 ("I am generally scheduled to work from 7 AM to 3 PM Monday through Friday . . . ."); <u>Robinson Ans.</u> (Ex. C) ¶ 3 ("I was scheduled to work 40 hours per week . . . .").

For weeks Plaintiffs choose or were unable to work a full base schedule, Plaintiffs were instructed to enter PTO hours into their weekly timesheets for the shifts or parts of shifts they did not work. *See* <u>Blake Dep.</u> (Ex. D), 33:3–18 ("I know PTO time was -- I had to take that time to get my 40 hours.") (confirming that PTO time was used to record at least 40 hours on weekly timesheets when he worked less than 40 hours in workweek, and that he was not aware of any workweeks "that [he] didn't get paid for at least 40 hours times [his] home rate"); <u>LeRoy Dep.</u> (Ex. E), 31:12–18 (responding affirmatively to following questions: "But you never worked less than 40 hours?", and "And even in workweeks when you didn't work 40 hours, you got paid the 40 hours?); <u>Robinson Dep.</u> (Ex. F), 21:15–22:6 (confirming that he either worked at least 40 hours per workweek or PTO was used to fill in time to record at least 40 hours on weekly timesheets). Therefore, as BSI instructed Plaintiffs that weekly timesheets should have at least 40 hours of recorded time, consisting of scheduled time, PTO hours, or combination thereof, Plaintiffs were ensured payment of their weekly base salaries regardless the number of hours Plaintiffs actually worked. Not once—out of the 468 weekly pay periods applicable to Plaintiffs' instant suit—did any of the Plaintiffs receive less than his weekly base salary even when Plaintiffs worked less than 40 hours in a particular workweek. *See* <u>Emp. Timecard History Report of Henry Blake: 01/03/2015–04/20/2018</u> (Ex. D8); <u>Emp. Timecard History Report of Frank LeRoy: 01/03/2015–08/10/2019</u> (Ex. E4); <u>Emp. Timecard History Report of Sean Robinson: 01/02/2015–01/05/2018</u> (Ex. J).

Plaintiffs contend that BSI informed them that they would be or were being paid on an hourly rather than salary basis. *See* <u>Blake Ans.</u> (Ex. A) ¶ 6; <u>LeRoy Ans.</u> (Ex. B) ¶ 6; <u>Robinson Ans.</u> (Ex. C) ¶ 6. Plaintiffs, however, confuse BSI's use of an hourly home-rate in calculating Plaintiffs' weekly base salaries—which, as discussed *infra*, is permitted under the salary basis test—with the legal status of payment on an hourly basis. For instance, Blake was informed of his exempt salaried status at orientation. As Brentina Horshaw, Vice President of Human Resources, explained in deposition:

> First, a salary employee is usually pulled out to the side when they're giving orientation instead of being in the room with all of the hourly employees. That's the first thing. They're pulled out separately. They're not in the normal orientation process.
>
> Second thing is that they're offered the handbook. And they sign off on it, . . . If they're salary, they get salary; if they're hourly, they get an hourly handbook.

<u>Horshaw Dep.</u> (Ex. I), 28:5–15; *see also* <u>Handbook Acknowledgement</u> (signed by Henry Blake) (Ex. K); <u>BSI Employment Handbook</u> (Ex. L) (specifying use for "SALARIED" employees).

Plaintiffs were also eligible to receive enhanced employee benefits not available to non-exempt hourly employees, such as additional PTO benefits, long-term disability benefits, and additional pension fund options. *See* <u>Horshaw Dep.</u> (Ex. I), 28:16–29:1 ("Hourly employees receive one type of benefits, salary employees receive additional benefits. That being PTO accrual, that being the long-term disability, and the different type of pension fund."); *see also* <u>Long-Term Disability Form (signed by Henry Blake)</u> (Ex. D2) (indicating in bold, on the top-left of the page, that the benefit is for "SALARIED" employees; also stating in bold, "TO CALCULATE YOUR WEEKLY COST: MULTIPLY YOUR BASE ANNUAL SALARY BY .0059 AND DIVIDE BY 52") (emphasis in original). Likewise, LeRoy and Robinson separately submitted and signed "Employee Benefit Enrollment Form(s)", which indicate in bold, on the

top-left of the page that the form is for "SALARIED" employees.  *See* <u>Employee Benefit Enrollment Form (signed by Frank LeRoy)</u> (Ex. E1); <u>Employee Benefit Enrollment Form (signed by Sean Robinson)</u> (Ex. M).

Finally, Plaintiffs were reminded of their exempt salaried status upon receipt of their performance reviews, which unambiguously state in bold, large-print font that they are, "EXEMPT EMPLOYEE PERFORMANCE EVALUATION[S]", *see* <u>Exempt Emp. Performance Evaluation (of Frank LeRoy), Feb. 2, 2013</u> (Ex. E2); <u>Exempt Emp. Performance Evaluation (of Frank LeRoy), Feb. 4, 2015</u> (Ex. E3); <u>Exempt Emp. Performance Evaluation (of Sean Robinson), Mar. 29, 2006</u> (Ex. N); <u>Exempt Emp. Performance Evaluation (of Sean Robinson), June 15, 2009</u> (Ex. O); Plaintiffs were also reminded of their salaried status, each week, when they filled their timesheets with at least 40 hours in order to receive their weekly base salary.

Accordingly, it is undisputed that Plaintiffs received and signed documents demonstrating their "SALARIED" status and that Plaintiffs were eligible to receive and/or elected to receive enhanced employee benefits available only to salaried employees.  It is also undisputed that Plaintiffs filled in their own timesheets to record at least 40 hours each week for the time period pertinent to this dispute, and that Plaintiffs ***never*** received less than their weekly base salary even when Plaintiffs worked less than 40 hours a week.  On these facts alone, it is clear Plaintiffs received a predetermined weekly base salary not subject to reduction.  Plaintiffs' own beliefs about being paid on an hourly basis have no bearing on the guaranteed, weekly base salary Plaintiffs admittedly received, nor was BSI's use of the home-rate in calculating Plaintiffs' weekly base salary in conflict with the salary basis test.

## 2. BSI's Use of An Hourly Rate System in Calculating Plaintiffs' Weekly Base Salary Does Not Violate the Salary Basis Test.

Case law from the Fourth Circuit demonstrates that an employer's use of an hourly rate system in calculating an employee's wages paid on a salary basis does not convert the employee's wages to payment on hourly basis, so long as the substance of the payment satisfies the salary basis test. *See, e.g., Kulish v. Rite Aid Corp.*, No. 11-3178, 2012 U.S. Dist. LEXIS 176760, at *10–16, 19–27 (D. Md. Dec. 13, 2012); *West v. Anne Arundel Cty.*, 137 F.3d 752, 761–63 (4th Cir. 1998); *Masters v. Huntington*, 800 F. Supp. 363, 367–68 (S.D. W. Va. 1992).

In *Kulish v. Rite Aid Corp.*, this Court determined that the pay structure of Rite Aid pharmacists satisfied the salary basis test even though Rite Aid had assigned each pharmacist an hourly wage rate and used the rate to calculate each pharmacist's bi-weekly base salary and any overtime compensation owed to pharmacists for a particular pay period. 2012 U.S. Dist. LEXIS 176760, at *10–16, 19–27. In *Kulish*, "Rite Aid scheduled its pharmacists to work a base of 77 hours during each two-week pay period." *Id.* at *10. The pharmacists were then paid their assigned hourly rate multiplied by their scheduled 77 hours worked, plus any overtime hours worked multiplied by the same hourly rate. *Id.* at *12. For occasions when pharmacists worked less than 77 hours during a two-week pay period and had not voluntary elected to take unpaid leave, the Court described that "Rite Aid use[d] a 'bump to base' system to ensure payment of the base salary level." *Id.* at *14. ("[A]s a general rule, for pay periods during which a pharmacist does not work the full 77-hour based, Rite Aid uses a 'bump to base' system to ensure payment of the base salary level."). Upon determining that the pharmacists' bi-weekly base salaries were "not subject to weekly fluctuations" and noting that overtime payments based on a straight-time hourly rate do not violate the salary basis test, this Court concluded that the Rite Aid pharmacists were indeed paid on a salary basis. *See id.* at 21–26.

25

In *West v. Anne Arundel Cty.*, the Fourth Circuit determined that emergency medical service ("EMS") captains and lieutenants were paid on a salary basis even though the County paid them a weekly salary based on a fifty (50) hour workweek.  See 137 F.3d 752, 762 (4th Cir. 1998).  In its decision, the court remarked:

> Plaintiffs receive a minimum predetermined amount every two weeks, plus additional compensation in the form of overtime.  They are paid for 50 hours of work each week, even if they only work 48 hours.  Plaintiffs thus appear to be employed on a salary basis.  Additional compensation does not alter the status of salaried employees, so the receipt of overtime does not defeat the salary basis of plaintiffs' employment.

*Id*. at 762 (internal citations omitted).

In *Masters v. Huntington*, the court described:

> As plaintiffs point out, and as is described in the Court's opinion, the City [of Huntington] purportedly paid all firemen below the rank of chief on an hourly basis.  Pay schedules set forth, *inter alia*, hourly rates of pay, and payroll records seemingly contemplated compensation of the firemen on an hourly basis

800 F. Supp. 363, 367 (S.D. W. Va. 1992).  Upon further analysis, however, the court determined that the firefighters were paid on a salary basis, reasoning:

> ***If form were to take precedence over substance***, it might be that the Court could, with relative ease, reach the conclusion that captains and deputy chiefs were paid on an hourly basis, excluding any possibility of an executive exemption. . . .

> ***Classically, and in substance***, the City has been paying its firemen an annual salary for work performed on their regularly scheduled shifts, without regard to actual hours worked.  It has only been hypothetically that firemen were treated as hourly employees.

*Id.* at 367–68 (emphasis added).

Like *Kulish* and *West*, where the Rite Aid pharmacists' bi-weekly salaries were based on 77 hours of scheduled work multiplied by an assigned hourly rate and the EMS captains' and lieutenants' weekly salaries were based on a 50-hour workweek multiplied by an hourly rate, in

26

the case at bar, each Plaintiff's weekly base salary was based on a standard 40-hour workweek multiplied by each Plaintiff's home-rate.  *See* <u>Seidl Dep.</u> (Ex. G), 32:4–6 ("[T]hey always get what they were hired for, a minimum of 40 hours at their home department rate."); <u>Blake Decl.</u> (Ex. D1) ¶ 7 ("Each of us work a normal 40 hour per week schedule . . . ."); <u>LeRoy Ans.</u> (Ex. B) ¶ 5 ("I am generally scheduled to work from 7 AM to 3 PM Monday through Friday . . . ."); <u>Robinson Ans.</u> (Ex. C) ¶ 3 ("I was scheduled to work 40 hours per week . . . .").

Also, like *Kulish*, where "Rite Aid use[d] a 'bump to base' system to ensure payment of the base salary level," 2012 U.S. Dist. LEXIS, at *14, BSI employed a similar system through its Negative PTO Accrual Policy and by instructing Plaintiffs to use PTO time record at least 40 hours on weekly timesheets when 40 hours were not worked to guarantee payment at the base 40-hour workweek even when Plaintiffs did not actually work 40 hours in a particular week.  *See* <u>Seidl Dep.</u> (Ex. G), 44:4–45:7 ("We would let him go negative on paid time off.") (describing that exempt employees can accrue negative PTO balances to receive pay for 40 hours each week even when they have not accrued sufficient PTO); <u>Horshaw Dep.</u> (Ex. I), 41:2–3 ("And [if] he didn't have the time in the bank, he would still receive the PTO time."); <u>Long Dep.</u> (Ex. H), 60:17–18 ("We go negative for them and make sure that they get their 40 hours.")*; see also* <u>Blake Dep.</u> (Ex. D), 33:3–18 ("I know PTO time was -- I had to take that time to get my 40 hours.") (confirming that PTO time was used to record at least 40 hours on weekly timesheets when he worked less than 40 hours in workweek, and that he was not aware of any workweeks "that [he] didn't get paid for at least 40 hours times [his] home rate"); <u>LeRoy Dep.</u> (Ex. E), 31:12–18 (responding affirmatively to following questions: "But you never worked less than 40 hours?", and "And even in workweeks when you didn't work 40 hours, you got paid the 40

hours?); <u>Robinson Dep.</u> (Ex. F), 21:15–22:6 (confirming that he either worked at least 40 hours per workweek or PTO was used to fill in time to record at least 40 hours on weekly timesheets)

As previously noted, out of a possible 468 weekly pay periods from the three Plaintiffs' time working at BSI applicable to the instant suit, not once did any of the Plaintiffs receive less than his weekly base salary.  *See* <u>Emp. Timecard History Report of Henry Blake: 01/03/2015– 04/20/2018</u> (Ex. D8); <u>Emp. Timecard History Report of Frank LeRoy: 01/03/2015–08/10/2019</u> (Ex. E4); <u>Emp. Timecard History Report of Sean Robinson: 01/02/2015–01/05/2018</u> (Ex. O). Also critical to Plaintiffs satisfying the salary basis test is that ***all instances of PTO usage*** were voluntary elections made by Plaintiffs; never did BSI instruct Plaintiffs not to show up for work and use PTO because their services were not needed.  *See* <u>Blake Dep.</u> (Ex. D), 36:6–7 (confirming he was never forced to use PTO); <u>LeRoy Dep.</u> (Ex. E), 23:6–12 (same); <u>Robinson Dep.</u> (Ex. F), 21:6–9 (same).  Thus, under all possible circumstances, even insufficient PTO, Plaintiff's weekly base pay was indeed "a predetermined amount . . . not subject to reduction because of . . . quality or quantity of the work performed."

Moreover, case law beyond the Fourth Circuit also supports that in this case, Plaintiffs were paid on a salary basis and is particularly instructive for describing the policy rationale of permitting employers use of hourly rate systems in paying exempt employees on a salary basis. In *Acs v. Detroit Edison Co.*, the Sixth Circuit determined that "exempt" employees for Detroit Edison, the seventh largest utility in the United States, were paid on a salary basis despite the company's use of single payroll system that "pa[id] all 8,500 of its employees—whether classified as salaried ('exempt') employees or hourly ("non-exempt") employees" based on hourly rates and hours worked.  444 F.3d 763, 765–71 (6th Cir. 2006).  The court described that:

Under this system, all Detroit Edison employees, from the CEO on down, must report the hours they work each week.  Every two weeks, the payroll system generates a paycheck based on the employee's reported hours. . . .

While Detroit Edison "employees normally work 40 hours a week," the company's pay policy states that "alternative work schedules may be uniquely designed to meet an organization's needs." . . . As a group, plaintiffs work a variety of daily shifts, including "shifts of 8-, 10-, 12-hours, or a combination," . . . some of which do not add up to 40 hours a week.  For example, an exempt employee who is assigned to 12-hour shifts typically works three shifts, or 36 total hours, the first week of a pay period, and four shifts, or 48 total hours, the second week of the pay period.  To ensure that employees receive 1/26th of their annual salary each two-week pay period, Detroit Edison instructs its 12-hour shift employees to report 40 hours for the week in which they work just 36 hours (three 12-hour shifts).

*Id.* at 765–66 (internal citations omitted).  The court further noted that there were related

business purposes for using the hourly rate system for salaried and hourly employees alike:

Detroit Edison uses an hourly payroll system for several business reasons.  Many of its salaried employees "receive hourly payments for hours worked over 40 in a workweek," . . .  and an hourly system offers one way to calculate those extra hours.  An hourly system permits the company to "record accrual and use of the various kinds of leave time (such as, vacation, sick and personal)."

*Id.* at 766.

In *Detroit Edison*, the Sixth Circuit choose the ***substance*** of how exempt employees were

actually paid rather than the ***form*** of the payroll system used by the company to achieve its

business objectives, including payment of guaranteed base salaries for exempt employees.  *See*,

*e.g.*, *id.* at 765–66; *see also Masters v. Huntington*, 800 F. Supp. 363, 367–68 (S.D. W. Va.

1992) (remarking that substance of payment should take precedence over form).  Also, like the

"bump to base" system in *Kulish*, the court in *Detroit Edison* aptly noted that the company had

implemented a policy to ensure exempt employees received their base salary for weeks when less

than 40 hours was actually worked, which likewise is accomplished by BSI's Negative PTO

Accrual Policy and instructions to Plaintiff's to use PTO time record 40 hours on weekly

29

timesheets when 40 hours were not worked.  *See supra* Memorandum § I.B.2 (discussion and citations on Negative PTO Accrual Policy and instructions on PTO usage).  Also, like *Detroit Edison*, BSI uses an hourly payroll system for various related business purposes.  Many of BSI's salaried employees, including Plaintiffs, received overtime compensation for hours worked beyond the standard 40-hour workweek; like *Detroit Edison*, an hourly system allows the company to more easily calculate overtime pay for exempt and non-exempt employees alike as well as to incorporate these functions with PTO accrual and usage into one, integrated company-wide payroll system.

### 3. Plaintiffs' Weekly Base Salaries Satisfy the "Reasonable Relationship" Test.

As previously noted 29 C.F.R. § 541.604(a) specifically allows employers to pay exempt employees overtime compensation calculated on a "straight-time hourly amount" without loss of the salary-basis exemption.  *Id.*  Sub-section (b) of the Section 541.604 also requires that "a reasonable relationship exists between the guaranteed amount and the amount actually earned."  *Id.* § 541.604(b).  More fully, the regulation states:

> An exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked, and a reasonable relationship exists between the guaranteed amount and the amount actually earned. ***The reasonable relationship test will be met if the weekly guarantee is roughly equivalent to the employee's usual earnings at the assigned hourly, daily or shift rate for the employee's normal scheduled workweek.*** Thus, for example, an exempt employee guaranteed compensation of at least $ 500 for any week in which the employee performs any work, and who normally works four or five shifts each week, may be paid $ 150 per shift without violating the salary basis requirement. The reasonable relationship requirement applies only if the employee's pay is computed on an hourly, daily or shift basis. It does not apply, for example, to an exempt store manager paid a guaranteed salary of $ 650 per week who also receives a commission of one-half percent of all sales in the store or five percent of the store's profits, which in some weeks may total as much as, or even more than, the guaranteed salary.

30

*Id.*

Plaintiffs' weekly base salaries compared to Plaintiffs' usual earnings result in ratios which satisfy the reasonable relationship test.  Each Plaintiff's weekly base salary (*i.e.*, standard 40-hour workweek multiplied by each Plaintiff's home-rate) compared to each Plaintiff's total earnings during the relevant time period result in ratios of: 1.533 (Blake), 1.570 (LeRoy), and 1.526 (Robinson), *see* Kastendike Aff. (Ex. P) ¶ 3, which satisfy the regulation's requirement of an employee's weekly guarantee being "roughly equivalent." to the employee's usual earnings for a normal scheduled workweek.  *See* § 541.604(b); *see also DOL Wage and Hour Opinion Letter*, No. FLSA-2018-25, (November 8, 2018) ("The regulations, of course, do not provide that a 1.5-to-1 ration of actual earnings to guaranteed weekly salary is the absolute maximum permissible ratio to satisfy the 'reasonable relationship' test.").  Thus, Plaintiffs' weekly base salaries compared to Plaintiffs' usual earnings satisfies the reasonable relationship test.

Accordingly, the undisputed facts in this case demonstrate that Plaintiffs were indeed paid on a salary-basis, as: (1) Plaintiffs received a guaranteed, weekly base salary greater than the minimum threshold of $455 per week even in instances when Plaintiffs worked less than 40 hours in a week, (2) precedent from the Fourth Circuit sets forth that employers may use an hourly rate system in calculating employees' wages paid on a salary basis without violating the salary basis test, and (3) a reasonable relationship existed between Plaintiffs guaranteed, weekly base salary and Plaintiffs' usual earnings.  Likewise, as discussed *supra* in § I.A. of this Memorandum, Plaintiffs also satisfy the primary duties for bona fide executives.  As such, Defendant requests that this Court grant its Motion for Summary Judgment, as Plaintiffs were exempt from the FLSA's overtime requirements as bona fide executives.

II.  **In the Alternative, Any FLSA Violations, If Proven, Were Not Willful and Therefore Subject to a Two, Not Three Year Statute of Limitations, and BSI's Good Faith and Reasonable Grounds for Believing Its Pay Practices Complied with Applicable Law Preclude an Award of Liquidated Damages.**

The undisputed facts in this case, based primarily on Plaintiffs' own sworn statements and deposition testimony, demonstrate that Plaintiffs were indeed employed as bona fide executives and thus exempt from the FLSA's overtime requirement.  In the alternative, however, if this Court determines that a triable issue exists as to Plaintiffs' exempt status, this Court should enact the standard two-year statute of limitations for FLSA violations, as BSI did not act willfully with regard to any alleged violations, and should also bar any award of liquidated damages, as BSI acted in good faith and had reasonable grounds for believing its pay practices complied with applicable law.

A.  **Any FLSA Violations, If Proven, Were Not Willful and Therefore Subject to a Two, Not Three Year Statute of Limitations.**

Actions for alleged violations of the FLSA's overtime provision "shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."  29 U.S.C. § 255(a).  The limitations period governing Plaintiffs' claims is thus dependent on whether any alleged violation by BSI can be considered "willful" within the meaning of the statute.  As there is no evidence to support a finding that BSI acted in willful violation of the FLSA, the FLSA's two-year limitations period must, as a matter of law, be applied in this action.

The meaning of the term "willful" for purposes of the FLSA's statute of limitations was addressed by the Supreme Court in *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988).  *Richland Shoe* held that in order for a willful violation to be established, it must be shown by the plaintiff "that the employer either knew or showed reckless disregard for the matter

32

of whether its conduct was prohibited by the statute." *Id.* at 133.  In so holding, *Richland Shoe* noted that an alternative standard used by some courts, which conditioned the issue of willfulness on whether or not the employer recognized the FLSA to be "in the picture," did not reflect congressional intent with regard to defining liability under the Act.  *Id.* at 134 n.12.

The *Richland Shoe* standard has since been repeatedly applied within the Fourth Circuit.  *See, e.g.*, *Chao v. Self-Pride, Inc.*, 232 Fed. Appx. 280, 286-87 (4th Cir. 2007) (citing *Richland Shoe* for the proposition that a willful violation will only be found "if (1) the defendant is reckless or deliberate with regard to whether its conduct complies with known provisions of the FLSA, or (2) the defendant is reckless or deliberate with regard to determining its obligations under the FLSA").  *Self-Pride* went on to confirm that an "actually malignant" mental state on the part of the employer was a predicate condition to finding a willful violation.  *Id.* at 287.  Finally, the Fourth Circuit has confirmed that the plaintiff in FLSA action bears the burden of proof as the willfulness of a violation.  *See Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 358 (4th Cir. 2011).

Here, even assuming *arguendo* that a triable issue exists as to whether Plaintiffs are in fact exempt employees, the record contains no evidence whatsoever that BSI "knew or showed reckless disregard" with respect to the alleged violation of the FLSA.

To the contrary, the uncontroverted evidence and testimony demonstrates that BSI regularly reviewed relevant publications discussing wage-hour issues, including but not limited to the Maryland Employment Law Letter, "Auditing Your Human Resources Department" by John McConnell, HR Magazine-Salary Survey published by SHRM, attended numerous seminars and workshops on those same issues offered by SHRM and CHRA and has reviewed the U.S. Department of Labor's website and regulations that

discuss which employees are exempt under the Fair Labor Standards Act.  BSI Ans. (Ex. R),

at Def.'s Resps. to Pls.' Interrogs. Nos. 15–18.  Based on that extensive review, the fact that

the three Plaintiffs regularly exercised managerial responsibilities and were paid a weekly

base salary for at least 40 hours per week, the Plaintiffs fit squarely within the "white

collar" exemption at 29 C.F.R. Part 541 of the DOL regulations.  *See id.*; *see also*

Memorandum at pt. I.

As Plaintiffs' evidence cannot support a finding of willfulness, Defendants respectfully

request that this Court find as a matter of law that the FLSA's standard two-year statute of

limitations governs Plaintiffs' claims in this action.

**B.    Defendant Good Faith and Reasonable Grounds for Believing Its Pay Practices Complied with Applicable Law Thus Precluding an Award of Liquidated Damages.**

Assuming *arguendo* that a triable issue exists as to Plaintiffs' exempt status, summary

judgment is nevertheless appropriate as to Plaintiffs' claim for liquidated damages.  The FLSA

provides that liquidated damages are appropriate in FLSA cases unless the defendant establishes

that its payroll practices were "in good faith and that he had reasonable grounds for believing

that his act or omission was not a violation of the Fair Labor Standards Act."  29 U.S.C. § 260.

The Fourth Circuit has explained that the FLSA places "a 'plain and substantial burden'

upon the employer to persuade the court that the 'failure to obey the statute was both in good

faith and predicated upon such reasonable grounds that it would be unfair to impose upon him

more than a compensatory verdict.'"  *Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997)

(quoting *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 357 (4th Cir. 1994)).

The imposition of liquidated damages on BSI would unquestionably be unfair based on

the undisputed facts of this case.  As discussed above, in concluding that the three Plaintiffs, all

working as Majors for BSI, were "exempt employees, BSI relied on and careful reviewed of a

number of treatises addressing this issue and regularly kept up to date on developments in the law.  *See* <u>BSI Ans.</u> (Ex. R), at Def.'s Resps. to Pls.' Interrogs. Nos. 15–18.

It has been stated by courts within the Fourth Circuit that "[t]he good faith defense requires that an employer provide adequate proof that it did not take an 'ostrichlike' approach to the FLSA by 'simply remain[ing] blissfully ignorant of FLSA requirements.'"  *Garcia v. Frog Island Seafood, Inc.,* 644 F. Supp. 2d 696, 712 (E.D.N.C. 2009) (quoting *Roy v. County of Lexington,* 141 F.3d 533, 548 (4th Cir. 1998)).   The foregoing facts, which Plaintiffs have produced no evidence to dispute, demonstrate that BSI did not simply 'stick its head in the sand' with respect to the FLSA, but rather took affirmative steps to determine and comply with its obligations. BSI therefore respectfully submits that judgment should be entered in their favor with respect to any claim for liquidated damages.

## CONCLUSION

In light of the foregoing, Defendant respectfully request that the Court grant its Motion for Summary Judgment, enter judgment in its favor, and dismiss Plaintiffs' Amended Complaint in its entirety.   In the alternative, for the reasons set forth in this Memorandum, Defendant request that this Court find that the FLSA's two-year statute of limitations be applied, and that no liquidated damages be awarded in this case.

Respectfully submitted,

 /s/ Kevin C. McCormick
Kevin C. McCormick (Bar No. 07674)
Kyle Y. Dechant (Bar No. 20763)
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1626
Tel.    (410) 347-8700
Fax     (410) 223-4379
kmccormick@wtplaw.com
kdechant@wtplaw.com
*Counsel for Defendant Broadway Services, Inc.*

*10291272*