**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **HENRY L. BLAKE, JR.,** *et al.,* | * |
| Plaintiffs, | * |
| v. | *  Civil Case No. SAG-18-0086 |
| **BROADWAY SERVICES, INC.,** | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Plaintiffs Henry L. Blake, Jr., Frank A. LeRoy, Jr., and Sean C. Robinson (collectively ("Plaintiffs") allege overtime pay violations under the Fair Labor Standards Act ("FLSA") by Defendant Broadway Services, Inc. ("Broadway").[1]  The parties have now filed cross-motions for summary judgment.  ECF 47, 50.  Broadway has also filed a motion to strike Plaintiff's motion for summary judgment, and certain of the exhibits attached thereto.  ECF 51.  This Court has considered each of those motions, and the various oppositions and replies associated with them.  *See,* ECF 52, 53, 54, 55.  Finally, Broadway has filed an unopposed motion for leave to file a surreply.  ECF 56.  No hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2018).  Initially, Broadway's motion to file a surreply will be granted, because its proposed surreply refutes an argument regarding the two-year statute of limitations and liquidated damages made for the first time in Plaintiffs' reply brief.  Otherwise, for the reasons that follow, Broadway's motion to strike will be denied, Plaintiffs' motion for summary judgment will be denied, and Broadway's motion for summary judgment will be granted.

---

[1] This action was conditionally certified as a collective action.  ECF 21.  After settlement negotiations, all claims were resolved, with the exception of those brought by these three Plaintiffs.

**I.    FACTUAL BACKGROUND**

During the times relevant to this action, Plaintiffs worked in Broadway's Silver Star Security ("SSS") Division, which provides commercial security and concierge services at business locations, including retail centers and hospitals. ECF 9, ¶ 4. Broadway uses a hierarchical command structure at each venue. The specific ranks of employees that can be assigned to a site, from lowest ranking employee to highest, are Security Officers, Sergeants, Lieutenants, Captains, and Majors. ECF 47-6 at 11:7-15 (Blake Dep.); ECF 47-15 at 12:9-11 (LeRoy Dep.). Plaintiffs in this case served as Majors. ECF 47-6 at 9:18-10:1; ECF 47-15 at 7:22-8:2; ECF 47-20 at 7:19-8:4 (Robinson Dep.).

A Major, as Broadway's highest ranking security officer at a site, is the primary point of contact for the client, and oversees the provision of Broadway's security services. *See, e.g.*, ECF 47-6 at 10:2-7 (describing Major as "in charge of the site itself and the officers"). Majors provide direction, training and guidance to other security personnel at the site; supervise the coordination of subordinate officers' work schedules; assist with the preparation of time sheets, personnel forms, and payroll for the site's security employees; receive and review applications for hiring; and terminate employees who do not meet performance expectations. *See* ECF 47-4, ¶ 5; ECF 47-7, ¶ 6; ECF 47-15 at 43:4-8, 44:10-45:2; ECF 47-21, ¶ 5. Majors also assist in conducting uniformed patrols at their assigned site. ECF 47-15 at 9:19-10:9.

Blake served as Major at the Annapolis Towne Centre from February, 2014 to April, 2018, where he supervised approximately 10 security personnel. ECF 47-6 at 11:21-12:4; ECF 47-7, ¶¶ 2-3. During the relevant time frame, LeRoy was the Major at the Mount Washington Campus and multiple Keswick account sites, where he managed approximately 29 security personnel, and he also managed the administrative and scheduling duties for the site at the

College of Engineering at Johns Hopkins University.  ECF 47-15 at 8:3-20.  Robinson worked for Broadway from 1998 through 2017. ECF 47-20 at 7:3-5.  During the relevant time frame, Robinson was the Major for the Bowie Health Center and Prince George's Hospital Center sites, where he supervised approximately 50 security personnel. *Id.* at 7:6-8, 8:6-21.

Even for Broadway's exempt salaried employees, it uses an hourly pay rate, or "home department rate," which is used to calculate any overtime pay.  *See* ECF 47-22 at 24:2-25:2 (Seidl Dep., Broadway Corporate Designee) ("Even I have a home department rate as president of the company.").  Broadway paid overtime to Plaintiffs at a straight-time hourly rate.  *E.g.*, ECF 47-7, ¶ 14; *see also* 29 C.F.R. § 541.604(a) (2018) ("An employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement . . . . Such additional compensation may be paid on . . . straight-time hourly amount . . . .").  Each exempt salaried employee is paid a guaranteed, weekly base salary, even if the employee works less than forty hours in a particular week.  ECF 47-22 at 31:9-14.  None of the Plaintiffs could recall receiving less than their weekly base salaries during the time period relevant to this case. *See* ECF 47-6 at 33:3-18; ECF 47-15 at 31:12-18; ECF 47-20 at 21:15-22:6. The payroll records substantiate their recollections that they were paid at or exceeding their weekly base salary amounts.  ECF 47-14 (Blake payroll records); ECF 47-19 (LeRoy payroll records); ECF 47-25 (Robinson payroll records).

Broadway affords certain benefits to its salaried employees not provided to its hourly employees, including additional paid time off ("PTO") benefits, long-term disability benefits, and different pension fund options.  ECF 47-24 at 28:16-29:1 (Horshaw Dep., Broadway Corporate Designee).  Each of the three Plaintiffs received, or opted out of, the benefits paid only to salaried employees.  *See* ECF 47-8 (Blake long-term disability election form for salaried

employees); ECF 47-16 (LeRoy employee benefit enrollment form for salaried employees); ECF 47-28 (Robinson employee benefit enrollment form for salaried employees). In addition, Plaintiffs' performance reviews were marked, in bolded font, "EXEMPT EMPLOYEE PERFORMANCE EVALUATION". *See, e.g.*, ECF 47-17, 47-18, 47-29, 47-30. However, Plaintiffs were not told that they would be paid as exempt salaried employees. *E.g.*, ECF 47-7, ¶¶ 4-5.

## II.    LEGAL STANDARDS

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

### III.   ANALYSIS

#### A.   Broadway's Motion to Strike

Broadway filed a "Motion to Strike" Plaintiffs' Cross Motion for Summary Judgment, and several of the exhibits attached thereto. ECF 51. Setting aside the substantive merits of Broadway's contentions relating to Plaintiffs' conduct during the course of discovery, this Court has repeatedly expressed its view that a motion to strike, in this context, is not an appropriate procedural vehicle. *See, e.g., Dowdy v. Santander Consumer U.S.A., Inc.*, Civil No. SAG-19-01386, 2019 WL 5455554, at *5 (D. Md. Oct. 14, 2019) (citing *Maxtena, Inc. v. Marks*, Civil No. DKC-11-0945, 2012 WL 113386 (D. Md. Jan. 12, 2012) for the proposition that the "Federal Rules of Civil Procedure only permit a motion to strike matters contained in pleadings, not those contained in other motions, brief, or attachments."). Instead of complicating the motions process with an improper and unnecessary motion to strike,

Broadway should have encompassed, within its opposition to Plaintiffs' dispositive motion, its arguments that Plaintiffs' motion should be denied as untimely, and that the exhibits should not be considered pursuant to Federal Rule of Civil Procedure 37(c)(1). Accordingly, this Court will deny Broadway's Motion to Strike, ECF 51, but will consider Broadway's substantive arguments as if they had been made in its opposition.

      **B.**      **The Parties' Cross-Motions for Summary Judgment**

The parties agree that the FLSA requires that Broadway pay any nonexempt employee overtime compensation at "one and one-half times" their regular pay rate. 29 U.S.C. § 207(a)(1) (2018). The parties also agree that, for any overtime hours that Plaintiffs worked, Broadway only paid them an amount equal to, not one and one-half times, their "home department rate." The crux of the parties' dispute is whether Plaintiffs fall under the FLSA's overtime exemption for workers "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). To qualify for the executive exemption, an employee must satisfy both the "primary duties test" and the "salary basis test." *See Counts v. S.C. Elec. & Gas Co.,* 317 F.3d 453, 455 (4th Cir. 2003); *see also Morrison v. County of Fairfax*, 826 F.3d 758, 761-62 (4th Cir. 2016). The burden to demonstrate that the exemption applies to Plaintiffs lies with Broadway.[2]

---

[2] Plaintiffs assert that Broadway must prove that the exemption applies "by clear and convincing evidence." ECF 50-1 at 9 (citing *Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir. 1993)). The *Shockley* rule appears to be rooted in the principle that FLSA exemptions be "narrowly construed against the employers seeking to assert them." *Darveau*, 515 F.3d at 337-38 (quoting *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 7 (1st Cir. 1997)). But as Broadway points out, recently, in *Encino Motorcars, LLC v. Navarro*, the Supreme Court "reject[ed] this principle," as unsupported by the FLSA's text. 138 S. Ct. 1134, 1142 (2018). Nonetheless, many courts in this District continue to impose the heightened burden of proof on employers invoking FLSA exemptions. *E.g.*, *Carrera v. EMD Sales, Inc.*, 402 F. Supp. 3d 128, 146 (D. Md. 2019) (applying the "clear and convincing evidence" standard, and collecting cases holding similarly). This Court need not address the issue itself, however, because even under a clear and convincing evidence standard, Broadway is entitled to summary judgment.

*Darveau v. Detecon, Inc.*, 515 F.3d 334, 337 (4th Cir. 2008). While Broadway must prove every element, it "need not satisfy every factor of every element; rather, the court will look to the totality of the circumstances in considering the factors collectively." *Kreiner v. Dolgencorp, Inc.*, 841 F. Supp. 2d 897, 904 (D. Md. 2012).

        1.    <u>Each Plaintiff's primary duty was to perform executive, managerial functions at his respective site.</u>

Beginning with the primary duties test, an employee must (1) have the primary duty of management of an enterprise or a customarily recognized department or subdivision of the enterprise; (2) direct two or more other employees; and (3) have authority to hire or fire other employees (or be afforded particular weight with respect to suggestions and recommendations about hiring, firing, advancement, or other change of employee status). *See* 29 C.F.R. § 541.100 (2018).[3]

As noted above, Plaintiffs concede that they each managed more than two employees. They instead focus their argument on the nature of their "primary duty." ECF 50-1 at 9-14. The regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Factors relevant to this determination include, but are not limited to,

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

---

[3] Section 541.100(a)(1) was recently amended, effective January 1, 2020, to increase the minimum applicable weekly salary from $455 per week to $684 per week. *See also* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 84 Fed. Reg. 51230, 51230-31 (Sept. 27, 2019). The parties make no argument, and indeed there is no indication from the rule's text, that this amendment has retroactive application. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). The current regulation differs in no other material way from the 2018 version.

*Id.*

Plaintiffs' first contention, that they do not manage "Broadway" because the provision of security services is only one small part of Broadway's large corporate structure, ECF 50-1 at 9, misstates the requirement of the law. To meet the primary duties test, an employee need only manage "a customarily recognized department or subdivision" of the overall employing entity. *See* 29 C.F.R. § 541.100(a)(2).

Next, Plaintiffs argue that they were not managers because they did not control scheduling at their respective sites. To illustrate their contention, they cite the fact that, at one point, Blake worked every day for 10 months. ECF 50-1 at 10; ECF 54 at 7. Plaintiffs' unsupported assertion that they did not control scheduling is contrary to their own testimony and other uncontroverted evidence about their scheduling duties. *See, e.g.*, ECF 47-6 at 12:16-19 (Blake testimony that if an employee couldn't work a shift, he would "reschedule it or cover it myself."); ECF 47-7, ¶ 6 (Blake Declaration listing his job duties to include "creating work schedules"); ECF 47-15 at 46:5 (LeRoy testimony, "I do the scheduling."); *id.* at 46:6-47:1 (LeRoy testifying that lieutenants and captains only do scheduling when LeRoy is on vacation, and that lower-ranked officers come to him to tell them when they can and cannot work); ECF 47-21, ¶ 5 (Robinson declaration listing job duties including "assisting with scheduling and payroll"); ECF 52-4 at 66:3-4 (Seidl testimony that "Major Blake would be responsible for scheduling his [own] hours, that's correct."). Plaintiffs further argue that Jack Long, Broadway's corporate designee, also performed scheduling duties. ECF 50-1 at 10. But Long only testified that he "do[es] time sheets" in order to "reconcile time to make sure the client is billed correctly." ECF 50-12 at 13:8-18. Even accepting Plaintiffs' questionable inference that Long has a hand in setting the schedules of Plaintiffs' subordinate officers, it does not undermine

Plaintiffs' own testimony that they determined the schedules of the subordinate officers at their respective sites.

Plaintiffs also suggest that, in fact, their duties were akin to those of regular security officers, not managers. *See* ECF 50-1 at 11; ECF 54 at 5. Notably, the entire section of Plaintiffs' opposition brief entitled "Management Responsibilities" is devoid of any actual citation to any testimony or evidence from Plaintiffs about their job responsibilities. *See* ECF 50-1 at 9-14. Instead, Plaintiffs include blanket assertions about what they believe the evidence to have shown, without any citation to evidence or testimony to support those assertions. *See, e.g., id.* at 11 ("For example, when Peter Seidl stated (as referenced in Defendant's Motion), that Plaintiff is the highest ranking person at that account, and that he is responsible for that account, 'responsible' is a relative term. Mr. Blake testified in his deposition that he had no final decisionmaking authority, and that all issues of any significance were first brought to Director Long's attention for authorization before any action was taken."); *id.* ("Plaintiff LeRoy's statement that he assumed the corporate office has final say over [hiring and firing] decisions illustrates exactly how much familiarity, and accompanying authority, he has with the process. Likewise, Robinson's statement that he just made recommendations and that those people were 'sent to Broadway,' indicates his lack of familiarity with any meaningful step in the hiring process."). As the Fourth Circuit has explained, upon a motion for summary judgment, the opposing party "must produce '*specific facts* showing that there is a genuine issue for trial,' rather than resting upon the bald assertions of his pleadings." *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985) (citation omitted). "Genuineness," the court continued, "means that the evidence must create fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds would

recognize as real factual disputes." *Id.* Under those standards, Plaintiffs' argument is unavailing.

First, Plaintiffs suggest that the job descriptions for Majors are similar to those for other, lower ranking Security Officers. ECF 54 at 5. In support of that claim, Plaintiffs provide a single job description for a Security Officer that lists, as one of the tasks, "Provides guidance and direction to Security Officers *when delegated to do so by a Supervisor or Director*." ECF 50-9 at 3 (emphasis added). The job description for Major states, "This position gives direction, training, and guidance to Captains, Lieutenants, and other Security personnel on the assigned shift." ECF 50-4. There is no evidence that Plaintiffs' duties to supervise and direct other officers required specific delegation from anyone higher ranking. Moreover, while Plaintiffs submit that the job description for Major is very similar to that for Security Officer, in fact the descriptions are markedly distinct. *Compare* ECF 50-3 at 9, *and* 50-4, *with* ECF 50-9. For example, the qualifications needed for a Major include, "Professional level of knowledge for management in security functions" and "Four (4) years of supervisory experience in security, military or law enforcement." ECF 50-4. The essential functions include "supervise and coordinate the overall operations and activities of assigned security personnel." ECF 50-3 at 9. No such requirements are included for the position of Security Officer. ECF 50-9. The fact that the physical requirements are similar, as are other generic employment requirements, and that both job descriptions list patrols as one of the responsibilities, does nothing to contradict Defendants' showing that Plaintiffs *primarily* performed managerial duties at their respective sites. *See* 29 C.F.R. § 541.700(b).

Second, and more to the point, Plaintiffs suggest that they, in fact, spent most of their time engaging in lower level security duties such as patrolling their designated sites, not

engaging in managerial tasks. ECF 50 at 14; ECF 54 at 5. Plaintiffs are correct that "[t]he question of how [employees] spent their working time . . . is a question of fact." *Calderon v. GEICO Gen. Ins. Co.,* 809 F.3d 111, 120 (4th Cir. 2015) (quoting *Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714 (1986)). However, *both* sides must adduce some evidence to support their positions, in order for a genuine issue of material fact to defeat summary judgment. Once again, Plaintiffs provide no citations to the record to substantiate their assertions about the nature of their work. *See, e.g.,* ECF 54 at 5 ("[T]he majority of Plaintiffs' working time was spent performing the same responsibilities as lower level officers.").

Even if Plaintiffs' unsupported statements had evidentiary support, a worker's "primary duty" is not necessarily defined as the task occupying the bulk or majority of the worker's time. *See* 29 C.F.R. § 541.700(b) ("[N]othing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work."). Instead, as previously explained, the primary duty is simply "the principal, main, major or most important duty that the employee performs." *Id.* Each of the Plaintiffs clearly identified themselves as a manager of one or more account sites. *See* ECF 47-6 at 10:2-10 (Blake testifying that he was "in charge of the site itself – and the officers"); ECF 47-15 at 45:7-13 (LeRoy testimony, "I'm a manager . . . I manage four sites."); ECF 47-20 at 7:22-9:21 (Robinson testifying that he "ultimately had the responsibility for [two] sites."). Each Plaintiff also testified that he supervised ten or more Broadway employees, and performed management duties. *See, e.g.,* ECF 47-6 at 12:8-11 ("[M]aking sure they were carrying out the duties as far as being on post, making sure that there were – we had a vehicle so making sure they were pretty much patrolling and securing the Towne Center."); ECF 47-15 at 10:17-18 ("My primary job is to be at the command center and supervise that shift."); ECF 47-20 at 8:8-9, 10:3-5 (stating that he supervised "about 50" employees, and listing his job

duties as to "[b]asically oversee day-to-day operations, which is work schedules, forwarding payroll for processing, interviewing candidates for hiring"). Finally, the pay discrepancy between Plaintiffs, and the lower-ranked security employees they supervised, corroborates their relative rank and management responsibilities. *See* ECF 52-2 at 2 (listing Major pay rate as $19/hour, Captain (the next highest rank) as $14/hour, and security officers at $10/hour); *see also* 29 C.F.R. § 541.700(a) (listing "the relationship between the employee's salary and the wages paid to other employees" as a factor to be considered in determining whether an employee's primary duty is management).

Plaintiffs further contend that the ultimate manager of security services was Broadway's Director of Operations, Jack Long. ECF 54 at 7. Long testified that his duties were to

> oversee all the security officers. I make sure posts are filled. At times I have to meet with the client. If there's an issue. If our security guards steal something, if they break something, if they wreck our cars, it's my responsibility to resolve that, and take that to my bosses. I do time sheets on Monday. I reconcile time to make sure the client is billed correctly and make sure the client isn't billed something they shouldn't be billed for. I do it all.

ECF 54-2 at 13:8-18. However, Long specifically testified that he had to rely on Majors to manage each individual work site. *See* ECF 47-23 at 25:21-26:6 ("[Blake] did – he ran the site. I mean, I wasn't there every day. So that's why I hire a Major, account manager to do that job. Because that's all the way down in Annapolis. I'm all of the way up here in Baltimore. So I have to have somebody that knows what they're doing to run that site."). While Plaintiffs suggest that they did not have final hiring and firing authority as Majors, that suggestion is belied by their testimony, the email evidence, and the testimony of Long. *See* ECF 50-6 at 32:11-33:21 (Long testimony describing how Blake would terminate an employee, write it up, and then Long would initial it); ECF 47-9 to -13 (emails from Blake to Long demonstrating Blake making hiring, firing, and promotion decisions).

The issues of whether or not Blake was told of his exempt status at orientation, or whether various documents did or did not contain the word "exempt," *see* ECF 50-1 at 11-12, are red herrings. The primary duties test turns on the job duties the employee actually performs, not on labels or advisement to an employee of his job status. *See* 29 C.F.R. § 541.700(a). Thus, whether certain documents reflect that lower ranking officers who receive overtime, like Captains, are exempt is irrelevant.

As demonstrated above, Broadway has shown, by even clear and convincing evidence, that each Plaintiff's primary duty at his respective site was performing executive functions, including supervising subordinate security officers, and setting their subordinates' work schedules. Each Plaintiff supervised more than two employees, and, at minimum, his hiring and firing recommendations were given significant weight. Because Plaintiffs have adduced no evidence to contravene Broadway's evidence (based largely on Plaintiffs' own testimony) that their primary duties were supervisory, there is no genuine issue of material fact to be resolved with respect to the primary duties test.

> 2. <u>Broadway's compensation scheme, as relevant to Plaintiffs, satisfies the "salary basis" test.</u>

Next, the Court turns to the salary basis test. Per the regulations, an employee is paid on a "salary basis" if "the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a). The parties agree that Broadway pays its Majors an hourly rate, and that the three Plaintiffs never got paid less than their base rate (defined as their hourly rate times forty hours), even for weeks in which they worked less than forty hours. *See* ECF 47-6 at 33:3-8; ECF 47-15 at 31:12-18; ECF 47-20 at 21:15-22:6. Plaintiffs entered their PTO into

weekly timesheets to account for time they did not work. *See, e.g.,* ECF 47-6 at 33:3-4; ECF 47-20 at 21:21-22:19. Broadway provided as exhibits to its Motion the entire timecard history for the three Plaintiffs, which shows no instances, out of 468 weekly pay periods, in which any Plaintiff received less than his weekly base salary. *See* ECF 47-14; ECF 47-19; ECF 47-25.

Plaintiffs focus much of their argument, and their limited evidence, on establishing their lack of awareness of their exempt status. *See, e.g.,* ECF 50-1 at 11-12. They rely on Blake's predecessor, Major Lawrence Lashley, who participated in hiring Blake. Lashley provided an affidavit stating that he had been paid an hourly rate, and had told Blake that he would receive an hourly rate. ECF 50-7 at 2.

Plaintiffs' position conflates "having an hourly rate" with "being a non-exempt employee." The fact that an hourly rate is calculated and paid for each Plaintiff does not equate to work being performed in a non-exempt status. *See Kulish v. Rite Aid Corp.*, Civil No. ELH-11-3178, 2012 WL 6532414, at *8 (D. Md. Dec. 13, 2012) (approving treatment of pharmacists as exempt where "the pharmacists' guaranteed salary was not subject to weekly fluctuations or otherwise the 'functional equivalent of an hourly wage,'" even though "pharmacists who worked extra shifts were paid an hourly rate based on their annual salary," because section 541.604(a) "expressly approved" such overtime pay); *see also West v. Anne Arundel County.*, 137 F.3d 752, 761-63 (4th Cir. 1998); *Masters v. City of Huntington,* 800 F. Supp. 363, 367-68 (S.D. W. Va. 1992). In *West,* which was superseded by a later regulation pertaining specifically to first responders, the Fourth Circuit concluded that emergency medical services captains and lieutenants were "paid for 50 hours of work each week, even if they only work 48 hours. Plaintiffs thus appear to be employed on a salary basis. Additional compensation does not alter the status of salaried employees, so the receipt of overtime does not defeat the salary basis of

plaintiffs' employment." 137 F.3d at 762 (internal citations omitted); *see Morrison*, 826 F.3d at 768 (noting that *West* was decided before the 2004 first responder regulation, 29 C.F.R. § 541.3). And in *Masters*, the Court noted that the fact that "[p]ay schedules set forth, *inter alia,* hourly rates of pay, and payroll records seemingly contemplated compensation of the firemen on an hourly basis," but determined that reaching the conclusion that they were hourly employees would mean that "form were to take precedence over substance." 800 F. Supp. at 367. Instead, the court reasoned, "Classically, and in substance, the City has been paying its firemen an annual salary for work performed on their regularly scheduled shifts, without regard to actual hours worked. It has only been hypothetically that firemen were treated as hourly employees." *Id.*

Ultimately, none of the witnesses who provided affidavits to Plaintiffs were able to opine as to whether Broadway hired Blake as an exempt salaried employee or not. *See, e.g.*, ECF 50-7 (Lashley affidavit, "I do not recall ever telling Mr. Blake that he was a salaried employee, nor that he would be guaranteed a minimum of forty (40) hours per week compensation, however, the position for which Blake was hired was based on an anticipated 40 hour work week."); ECF 50-8, ¶ 3 (Laperouse affidavit stating "During Mr. Blake's hiring, I did not discuss with him whether he would be paid on an hourly or salaried basis."); *id.* ¶ 6 ("At no point in time during the applicable time frame, from 2015 through 2018, did any representative from Broadway Services, Inc. communicate to me that Mr. Blake was a salaried employee."); ECF 50-11, ¶ 3 (Schiffer affidavit stating, "During Mr. Blake's hiring, I did not discuss with him whether he would be paid on an hourly or salary basis."); *id.* ¶ 4 ("At no point in time during the applicable time frame, from 2015 through 2018, did I have any conversation with any representative from Broadway Services, Inc. as to whether Mr. Blake was a salaried or hourly employee."). The fact that Blake received a certain "home rate," or hourly pay rate, as described above, does not

resolve that issue. Moreover, what Blake was or was not told at the time of his hiring does not determine whether he qualifies as an exempt employee on the basis of his job duties and pay structure. *See* 29 C.F.R. § 541.602(a) (focusing on whether "the employee regularly receives" a "predetermined amount" each relevant pay period); *Masters*, 800 F. Supp. at 367 (emphasizing the need to focus on substance over form, in order to avoid creating a "hypothetical retrospective construction of a rate structure" (internal alteration omitted) (quoting *Brennan v. Valley Towing Co.*, 515 F.2d 100, 106 (9th Cir. 1975))).

The issue about the existence of, and the limitations of, Broadway's asserted "Negative PTO Accrual Policy" is another red herring.[4] The governing question is not how a hypothetical Major who depleted his PTO beyond the point where Broadway was willing to pay would be treated, particularly because Broadway employees testified unanimously that it had never happened. *See, e.g.*, ECF 54-3 at 45:4-13 (Seidl testimony, "If the negative gets too big, then they would call him in and say you don't have any vacation. But that never happens."); ECF 54-4 at 60:14-61:1 (Long testimony that he is not aware of any limit on how long Broadway will allow an employee to be negative on PTO). The issue is how the Plaintiffs in this case were paid, and what evidence the parties have submitted about the Plaintiffs' received payments. No evidence demonstrates that any Major failed to receive a full weekly base salary, under any circumstance. Plaintiffs' uncontroverted testimony, and their payroll records, establish that they received, at minimum, their weekly base salary during every single pay period in the relevant time frame. Any use of PTO was initiated by the Plaintiffs, not as a result of Broadway's instruction. *See* ECF 47-6 at 36:6-7; ECF 47-15 at 23:6-12; ECF 47-20 at 21:6-9. In addition,

---

[4] Though Plaintiffs contend that Broadway's HR Policy Manual makes no reference to "Negative PTO," there is a section on "Advanced PTO," which discusses an exempt employee using PTO that has not yet accrued. ECF 50-3 at 5 (Section 8.IV.B.7 of Broadway's HR Manual).

the record is uncontroverted that Plaintiffs received the extra employment benefits Broadway reserved for salaried, exempt employees. *See* ECF 47-24 at 28:16-29:1.

Plaintiffs' primary piece of evidence is, fundamentally, of little relevance. Plaintiffs rely on the contract for services between Broadway and the client managing the site at which Blake worked, Greenberg Gibbons Commercial Corporation ("the Contract"). ECF 50-10. The Contract outlines, *inter alia*, the compensation structure that Broadway will charge the client for services rendered by each level of security officer, and the contract includes overtime rates for each level of employee, including Major. *Id.* at 2. Plaintiff's view is that the Contract is "indicative of Defendant's policy to pay Majors an overtime rate." ECF 50-1 at 6. In fact, however, the Contract evidences no such policy. The rates listed in the Contract bear little relationship to the actual rates Broadway employees are paid for their services (which makes sense, so that Broadway can make a profit from its security business). *See* ECF 52-1 at 52:15-53:21 (Long testimony explaining the difference between the pay rate and the billing rate to the client). The Contract does not represent anything about the rates, or benefits, Broadway pays its employees, and only reflects the rates Broadway charges one of its many clients. Ultimately, the fact that Broadway charges its client overtime rates for its salaried employees is unsurprising. While Plaintiffs assert that they "have no reason to suspect that the Contract differs in any way from the established corporate policies of BSI," they proffer no evidence, testimonial or otherwise, to support that view. Their stand-alone assertions are unpersuasive, let alone sufficient to create a genuine issue of material fact. *See Ross*, 759 F.2d at 364.

Finally, the parties address the "reasonable relationship" test, which governs the circumstances in which employers can pay overtime, on a "straight-time hourly amount" to their

exempt employees, without loss of the salary-basis exemption. 29 C.F.R. § 541.604(b). The governing regulation provides:

> The reasonable relationship test will be met if the weekly guarantee is roughly equivalent to the employee's usual earnings at the assigned hourly, daily or shift rate for the employee's normal scheduled workweek. Thus, for example, an exempt employee guaranteed compensation of at least $500 for any week in which the employee performs any work, and who normally works four or five shifts each week, may be paid $150 per shift without violating the salary basis requirement.

*Id.* A Department of Labor Opinion Letter[5] suggests that the reasonable relationship test is satisfied if the ratio between an employee's "usual weekly earnings" and his guaranteed weekly salary is equal to or less than 1.5-to-1, but specifies that a ratio that "materially exceed[s]" a ratio of 1.5-to-1 would not satisfy the test. U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter No. FLSA-2018-25, at 2 (Nov. 8, 2018).

Here, over the relevant time frame (between 2015 and 2018), the ratios for the Plaintiffs were between 1.526-to-1 and 1.570-to-1. ECF 47-31. Those rates exceed, but not in a material way, 1.5-to-1. *See* Opinion Letter No. FLSA-2018-25 at 2 ("The regulations, of course, do not provide that a 1.5-to-1 ratio of actual earnings to guaranteed weekly salary is the absolute maximum permissible ratio to satisfy the 'reasonable relationship' test."). Plaintiffs' suggestion, ECF 50-1 at 17-18, that the Court should instead cherry-pick the highest paying weeks and calculate those ratios perverts the purpose of the test, which is to look at a worker's "usual earnings," not to ascertain whether there are certain instances in which the ratio exceeds the test. *See* Opinion Letter No. FLSA-2018-25 at 2.

---

[5] While the Department of Labor's Opinion Letters are informal adjudications lacking the binding force of law, "they constitute a body of experience and informed judgment" and are accordingly "entitled to considerable weight[,] and the court may properly resort to them for guidance." *Turner v. Human Genome Sci., Inc.*, 292 F. Supp. 2d 738, 746 n.5 (D. Md. 2003) (citing *Schultz v. W.R. Hartin & Son, Inc.*, 428 F.2d 186, 191 (4th Cir. 1970); *see also Christensen v. Harris County*, 529 U.S. 576, 587 (2000).

Ultimately, the Court concludes that the salary basis test, like the primary duties test, is met by clear and convincing evidence. With both tests satisfied, Broadway has successfully demonstrated that Plaintiffs were exempt employees pursuant to 29 U.S.C. § 213(a)(1). Thus, in the absence of evidence to show a genuine issue of material fact, summary judgment in Broadway's favor is warranted.

## IV.   CONCLUSION

For the reasons set forth above, Broadway's Motion to File a Surreply, ECF 56, will be GRANTED; Broadway's Motion to Strike, ECF 51, will be DENIED; Plaintiffs' Motion for Summary Judgment, ECF 50, will be DENIED; and Broadway's Motion for Summary Judgment, ECF 47, will be GRANTED. A separate Order will be filed herewith, and the Clerk will be directed to CLOSE this case.

Dated:  April 6, 2020                                         /s/
                                                    Stephanie A. Gallagher
                                                    United States District Judge